**People of the State of Illinois, Appellee, v. Henry Odom, Defendant-Appellant.**

Gen. No. 68–54.

Fifth District.

April 28, 1970.

■■■■■■■■

■■■■■■■■■■■■■■

Terryl W. Francis, of Granite City, for appellant.

Robert H. Rice, State's Attorney, of Belleville (John M. Karns, Jr., of counsel), for appellee.

MORAN, P. J.

Defendant, Henry Odom, was convicted in a trial by jury of rape and burglary and sentenced to the penitentiary for a term of twenty-five to fifty years.

Defendant urges, among other things, that the lineup procedure by which he was identified was so conducive to irreparable misidentification as to deny him due process of law and that the uncorroborated testimony of the complaining witness is not of the affirmative character required by law and is insufficient to support the conviction in light of defendant's alibi testimony.

The complaining witness, Mrs. Marcia Buff, 25, testified at trial that on May 21, 1967, she was living at 782 Lindberg Drive, East St. Louis, Illinois, in a rented, two-bedroom house with her two children, ages 9 and 4. Her husband was in Viet Nam at that time. No one else had access to the house. She went to bed around 2:30 a. m., Sunday, May 21, 1967. Her front and back doors were locked, as well as the screen door on the back porch and a chair was pushed against the back door as an additional precaution because the house had been broken into a month earlier.

While she was asleep in her bedroom at the front of the house, someone said, "Wake up." A man was standing over her with a knife at her throat. She saw by a luminous clock that it was five o'clock. The knife had a long thick blade like a butcher knife used in a grocery store, but she could not recall in which hand he held it.

374

She testified, "It was just dusk," and there was a small night-light in the bathroom and a streetlight outside the window. She stated further, "It wasn't bright light, but it was just beginning to get light in the wee hours of the morning." In response to the question, "Could you see in your room?" she stated, "Yes, I could." She saw a man who asked her twice for money, but she had only some small change. She described him at trial as "wearing an overcoat and wash pants and a sport shirt. . . . He wore dark glasses and he had a light beard. Not a beard, but a growth. He needed a shave." He also had a moustache.

As to subsequent events, she testified as follows:

> After I told him I didn't have any money, he said, "Get up," so I got up with the knife at my side and he took me into the living room and put my face against the wall and he started kissing me on the shoulder, and he said, "Where is your money?" and I said I didn't have any. He said, "Why do you live alone?" and I said, "I don't, my husband works nights," and he said, "What time will he be home?" I could see it was almost five, so I said, "He comes home around six," and he said, "What time is it?" and I looked at the clock and that is when I saw it was after five o'clock. He started kissing me on the shoulder again and said, "I want your money," and I said, "I don't have any." I said, "My house was broken into a month ago and my husband takes all the money to the bank on Friday night." He then said he wanted to have sexual intercourse. I begged him. I said, "No, please, don't." I said, "Just go and leave me alone," and he said, "I want sexual intercourse," and I said, "No, please," and at this time my little girl came into the living room.

Her four-year-old daughter, who had been sleeping in the bed with her mother, came into the room.

375

■■■■■

She looked up at him and she said, "Mommy," and he said, "Get that damned kid out of here or I will kill her," so I calmed myself down and told her to go back into the bedroom and she did, and then he said, "Come out onto the porch" and so he pushed me ahead of him and we got almost to the kitchen door where the kitchen is, and he said, "No, it is too light, you will see me too plain," so he turned me around and went into my other bedroom, the small bedroom and made me lie down on the bed and then he said, he started kissing me on my stomach, and he said, "Put it in," and I said, "No, I can't, just go and leave me alone," and he said—I says, "My husband is going to come home," and he said, "If he comes home before I am finished, I will kill him. I have a gun." I don't know if he had a gun or not. And then he forced himself on me and then he got up and I kept begging him to leave, and he says, "You will scream," and I said, "No. I won't. Just go and leave me alone." I said, "My husband is going to come home." He says, "You will scream," and I said, "No, I won't. Just go please."

She testified further that penetration was accomplished, that she did not consent and that she did not resist out of fear for her life and the lives of her children.

After the assailant left, she ran to the kitchen, slammed the door and pushed the clothes dryer in front of it. She then ran to the living room door and screamed for help, but no one came, so she went to the lady next door. Her neighbor called her parents and the police. Two policemen arrived around 5:30 a. m., but she does not recall their names. It was 5:15 when she ran out of her house. She stated to them that her assailant was a Negro who wore glasses, had a moustache, and was taller or a "wee bit taller" than she, but that the outstanding feature about him was that he wore dark horn-rimmed glasses.

Later that morning, a Detective Johnson and another detective brought a sketch of a man to her house. She testified that the man depicted in the sketch was the one who raped her, but he wore glasses. The officer then drew circles around the eyes of the sketched man and she definitely identified him. No other pictures or sketches were ever shown to her, nor was the sketch introduced into evidence at the trial.

On Monday, May 22, she was taken to the East St. Louis jail to view a lineup of five Negro men. She identified the man in the middle as being her assailant. At the trial, she identified the defendant as her assailant and stated that he was the man she had identified from the lineup. She could remember nothing unusual about the way any of the lineup participants had been dressed and did not remember how many of them wore glasses.

She did not know how far the streetlight was from the windows, but there were metal awnings on the front windows. She could not remember if the collar of her assailant's overcoat was turned up. Although there was a night-light in the bathroom, they were never in there. There were no lights on in the bedroom, but from the streetlight, she testified, "it was light enough to see." He was behind her from the time they left the bedroom and stayed in the living room until they went into the second bedroom. There were no lights in the second bedroom which faces east.

After the lineup, the defendant was taken to a room with the complaining witness, her parents and several officers, and questioned. He was wearing glasses and she had an opportunity to observe him throughout that time. She had also stated that her assailant had a Negro dialect. On redirect she testified that the voice of the defendant she heard in the interrogation room was the same she had heard in her home.

Detective L. G. Adams testified that he participated in the arrest of the defendant and the investigation of

this case. The lineup area where defendant was shown was enclosed with a full screen that the witness could see through. The defendant was positioned in the middle of the five men shown. Adams testified that the complaining witness identified the defendant from the lineup. He stated that "she was somewhat reluctant at first. She was not sure at first."

All of the lineup participants were Negroes and were wearing civilian clothes. Only the defendant wore glasses and either three or four had moustaches. At least three of the five were six feet tall or taller and one of the participants was only 20 or 21 years of age. Defendant's beard appeared to be two or three days old at the time of the lineup. The police report did not indicate how the participants were dressed.

Following the lineup the defendant and the complaining witness were in the interrogation room approximately twelve minutes.

The following stipulations were made: Police dispatch was made on May 21 at 5:22 a. m. The complaining witness was taken to Scott Air Force Base at 8:50 a. m. for examination, and 21 slides taken were all positive of male sperm.

Joyce Naomi Odom testified that on May 21, 1967, she was living with her husband, her baby and her brother-in-law, the defendant. On Saturday, May 20, she stated, defendant shaved, cleaned up and left the house around 5:30 or 6:00 p. m. He returned around 12:00 midnight and went to bed on the couch where he usually slept. She was awake at 5:00 on the morning of Sunday, May 21, as it was customary for her to get up and fix her husband's breakfast at that time. She had forgotten that it was Sunday and her husband did not have to work. At that time Henry was in the bathroom and she spoke to him. She was seven months pregnant at the time and had to use the bathroom frequently.

On cross-examination, she testified defendant had been living with them for six or seven months. He had gotten up early that Sunday morning to pick up his children. She was home later that morning when the police came to arrest the defendant. She was aware that defendant was charged for an occurrence which took place around 5:00 on Sunday morning, but at no time did she tell the police or State's Attorney that they had the wrong man. She stated that she had told her husband to tell them.

George Sansom testified that he was the magistrate before whom the preliminary hearing had been held. Referring to the notes he had taken at the hearing, he testified that the complaining witness had first described her assailant to the police as "colored, taller than I, moustache, had a coat, dark framed glasses." At the preliminary hearing she had testified that her assailant had not kissed her. She had also testified that she did not know what color or type of shirt her assailant was wearing.

Detective Charles Vaughn testified that he was behind the screen in the lineup room when the lineup took place, but he was not with the complaining witness at that time. Defendant was the only participant wearing glasses during the lineup. Defendant had asked for his glasses prior to the lineup.

Immediately after the lineup, he went into the interrogation room with the complaining witness, her parents, and Lt. Johnson. He stated:

A. "When I first went in, she wasn't saying anything. The father was talking and he asked her if one of the five guys in the lineup was the person that had raped her and she said she think it was the one in the glasses."

Q. "This was after the lineup had taken place?"

A. "Yes, sir."

379

Q. "Was she being led in any way by Lt. Johnson and her mother and father?"

A. "I couldn't say, because Lt. Johnson wasn't saying anything. The only somebody that was talking was her father."

Q. "As to him, was he leading her then?"

A. "No, he just told her he wanted her to be sure if it was the right man or not."

On cross-examination:

Q. "Then they brought Henry into that room, is that right, later on?"

A. "Yes, sir."

Q. "Did Marcia, at that time say she was sure?"

A. "Yes, sir."

Q. "But at that time, she, in fact, became hysterical when they brought him into the same room with her?"

A. "That's right."

Odell Odom testified that he was the brother of the defendant and that he measured the distance from the streetlight previously mentioned to the front of complaining witness' house to be 119 feet. He testified further that there were aluminum awnings on the front of the house.

Defendant, Henry Odom, testified that on the evening of May 20, he shaved, cleaned up and went out to the Blue Note Club for the evening. He returned around midnight and went to bed in the living room. About five o'clock he was awakened by the alarm on the television and used the bathroom.

He described the other participants in the lineup. One was six feet and one-half to two inches tall, light or medium complexion, about 21 years of age and had no beard or moustache. Another was "approximately five feet eight, between five feet eight or five feet ten or

eleven inches, give or take an inch or inch and a half, say. He had a heavy moustache and was of dark complexion and he was in need of a shave." The third was "obese, just about two inches taller than me and of about the same complexion, but there is no similarity." The fourth was tall and dark complexioned. Defendant was the only one wearing glasses and not having shaved since Saturday night, he needed a shave.

Defendant first saw the complaining witness after the lineup when he was presented alone to her in the interrogation room with the complaining witness' parents and Lts. Johnson and Vaughn. He testified that he does not smoke or drink, never has, and did not drink that evening. He further testified that he has never seen or been in the complaining witness' house. On cross-examination he testified that he was 35 years of age, married, with five children, but separated from his wife. He has worn glasses for some time because of myopia and astigmatism. He testified that the police told him to keep the glasses, that they did not ask for the glasses until after the lineup, and that he did not ask to wear the glasses during the lineup. He is five feet, six inches, in height and weighs 160 pounds. After the lineup he was taken to the interrogation room and seated three to four feet from the complaining witness for twelve to fifteen minutes. At that time of the year at five o'clock in the morning it was usually dark or dusk.

Thomas Edwards, a deputy sheriff in the St. Clair County Sheriff's Office testified that he knows the defendant and has had occasion to be in the Blue Note socially when defendant was there. He testified:

A. "The time I saw him, a couple of times I saw him there, it was sweet soda. That is what I saw him drink. What he did afterwards, I don't know. I only saw him drink soda."

Q. "You have never seen him drink anything alcoholic?"

A. "No."

The following testimony was part of that given at a hearing on a motion to dismiss on the basis that the lineup procedure was of such nature as to preclude the identification being a fair one.

Detective Charles Vaughn testified, in part, that none of the other participants in the lineup wore glasses and that no one took the defendant's glasses from him until after the lineup was over.

Detective L. G. Adams testified that he assisted with the lineup. He described two of the other participants. One was about 21 years of age, six feet or six feet, one inch, in height and light complexioned. The second was about five feet, eleven inches tall, 28 years of age and had a bushy moustache. He could not recall the other two. He thought the defendant was wearing a white shirt and dark trousers, but no coat, during the lineup. He stated that it is normal procedure during an investigation to take several photographs, rather than just one, to a witness. Defendant was rather "rowdy looking" when he was arrested on Monday morning. In response to the question, "Was Henry Odom taken out of the lineup into the detective's office in front of the witnesses?" he stated, "After positive identification had been made."

 Police conduct of extrajudicial lineup, showup and photoidentification procedures has recently been subjected to severe criticism and the issue of identification has become one of admissibility as well as credibility. People v. Wade, 388 US 218, 18 L Ed2d 1149, 87 S Ct 1926; Gilbert v. California, 388 US 263, 18 L Ed2d 1178, 87 S Ct 1951; Stovall v. Denno, 388 US 293, 18 L Ed2d 1199, 87 S Ct 1967; Simmons v. United States, 390 US 377, 19 L Ed2d 1247, 88 S Ct 967; Foster v. California,

394 US 440, 22 L Ed2d 402, 89 S Ct 1127; People v. Blumenshine, 42 Ill2d 508, 250 NE2d 152.

■ It has been recognized that judged by the totality of the circumstances, the conduct of identification procedures may be so unnecessarily suggestive and conducive to irreparable mistaken identification as to be denial of due process of law. Foster v. California, supra; Stovall v. Denno, supra; People v. Blumenshine, supra.

Defendant argues that the in-court identification and testimony concerning the police station and other out-of-court identification denied him due process. However, our Supreme Court has interpreted Stovall to mean that "a defendant so claiming must prove that the confrontation conducted was so unnecessarily suggestive and conducive to irreparable mistaken identity that he was denied due process of law." People v. Nelson, 40 Ill2d 146, 150, 238 NE2d 378; People v. McMath, 40 Ill2d 388, 240 NE2d 593.

■ In McMath the court stated where "identification of the defendant could have been established apart from and independent of the police station and in-court identification," due process was not violated. In the present case the complaining witness was awakened by a man standing over her with a knife which she could feel and see. She could see him well enough to observe several physical characteristics of her assailant, including the way he was dressed. She also recognized his voice while in the police station. She was in close proximity and face-to-face with him during the rape. After considering the record in its entirety, we are unable to say that the out-of-court identification proceedings denied the defendant due process of law under the standards laid down by our Supreme Court in McMath.

■ However, the record in this case discloses that there was no evidence offered in mitigation and aggravation; nor does the record show that the defendant was aware of his right to a hearing on mitigation and aggra-

vation. This is essential. People v. Harris, 66 Ill App2d 46, 213 NE2d 588; People v. Tompkins, 112 Ill App2d 251, 251 NE2d 75.

■ In view of the foregoing, it is obvious we are not in a position to express an opinion concerning the alleged excessiveness of the sentence imposed. The judgment of conviction of the Circuit Court of St. Clair County is affirmed, but the sentence imposed is vacated and the cause is remanded to said court with directions that defendant be granted a hearing in accord with the views expressed herein to determine the proper sentence to be imposed.

Judgment of conviction affirmed, sentence vacated and cause remanded with directions.

EBERSPACHER and GOLDENHERSH, JJ., concur.