Thomas R. ISRAEL, Warden of Illinois State Penitentiary, Menard, Illinois, Defendant-Appellee,

v.

Henry L. ODOM, Plaintiff-Appellant.

No. 74–1519.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 9, 1975.

Decided July 28, 1975.

Rehearing and Rehearing En Banc Denied ·Sept. 4, 1975.

Jerome J. Schlichter, East St. Louis, Ill., for plaintiff-appellant.

William J. Scott, Atty. Gen., Mark Glass, Asst. Atty. Gen., Springfield, Ill., for defendant-appellee.

Before FAIRCHILD, Chief Judge, TONE, Circuit Judge, and PERRY, Senior District Judge.[*]

FAIRCHILD, Chief Judge.

Petitioner Henry L. Odom brought this action seeking a writ of habeas corpus pursuant to 28 U.S.C. §§ 2241–54. Odom is presently incarcerated in the Illinois State Penitentiary, Menard, Illinois, as a result of his conviction for burglary and rape. A direct appeal was taken from the judgment of conviction to the Illinois Appellate Court, Fifth Appellate District, which affirmed the conviction, *People v. Odom*, 123 Ill.App.2d 373, 259 N.E.2d 370 (1970).[1] Odom's subsequent petition for a writ was denied by the district court and he appeals.

The complaining witness, Mrs. Marcia Buff, testified at trial that she was awakened during the early morning hours of May 21, 1967 by an intruder standing over her bed, holding a carving knife to her throat. She saw by a luminous clock that it was 5:00 a. m. She testified that it was "just dusk" at this time and that it was "just beginning to get light in the wee hours of the morning." In addition, there was a small night light burning in the bathroom and street light outside of her window. The parties stipulated that sunrise was at 5:44 a. m. on the morning in question. Mrs. Buff testified that she could see in the room, and described the intruder as being a Negro, with dark-rimmed glasses, a light beard, moustache, and wearing an overcoat, wash pants, and sports shirt. She testified that the outstanding feature of the intruder's appearance was his glasses.

The intruder forced Mrs. Buff to get out of her bed and, holding the knife at her side and walking behind her, took her into the living room, put her face to the wall, and kissed her shoulders. Remaining behind her, he then took her into a second bedroom, which was un-

---

[*] Senior District Judge Joseph Sam Perry of the Northern District of Illinois is sitting by designation.

1. The Appellate Court decision, while affirming the conviction, vacated the 25 to 50 year sentence imposed by the trial court so that facts in mitigation and aggravation might be considered. After the original sentence was reimposed, a second appeal was taken, limited solely to the issue of sentence, and the term of imprisonment was reduced to 8–25 years.

lighted, and forcibly raped her. During these events, the intruder questioned the victim concerning whether she had any money and the whereabouts of her husband. Mrs. Buff testified that her assailant left the house by 5:15 a. m.

Following her assailant's departure, Mrs. Buff ran to a neighbor's home and notified the police. Shortly thereafter, two patrolmen arrived. Mrs. Buff described her assailant to the police as follows: "He was colored; he was taller than I; he had a moustache; he was wearing a coat; dark rimmed glasses." Mrs. Buff is 5 feet 4 or 4½ inches tall. Later that morning, a Detective Johnson of the East St. Louis police department brought a sketch of a man to her house. Detective Johnson exhibited the sketch to the victim and inquired: "Does this resemble the man?" Mrs. Buff testified that: "I recognized the picture . . . [a]s the man who attacked me. * * * It looked like him but . . . this man had wor[n] glasses." Detective Johnson then drew glasses on the sketch and she stated: "Yes, definitely, that's him." No other pictures or sketches were ever shown to the victim and the sketch was not available in the police files to be introduced into evidence.[2]

The next day, May 22, 1967, Mrs. Buff went to the East St. Louis police station

to view a lineup. No photographic record of the lineup was made or preserved and the police report, as reflected in the testimony of the officers present, was incomplete. It appears from the record, however that all five participants were Black and that no distinctive clothing was worn. Three of the participants were approximately six feet tall or taller while the petitioner was only 5 feet 5½ inches. Only Odom wore glasses. A police officer testified that the victim identified Odom as her assailant although "she was somewhat reluctant at first."[3]

After the lineup, Mrs. Buff and her parents were brought into another room, and Odom was also brought in. The purpose for this showup was apparently to obtain a voice identification. While in her presence, Odom was questioned by the authorities concerning the crime. The victim testified that she was able to identify the defendant's voice as that of her attacker. A police officer testified that the victim stated that she was "sure" that Odom was her attacker and became hysterical when they brought him into the same room with her.

During trial, in addition to testifying concerning the pretrial identifications of Odom, Mrs. Buff identified him as the perpetrator of the crime.[4]

---

2. Mrs. Buff testified that the sketch was not a photograph but was similar to an artist's sketch and that it represented a particular man whom she recognized as her assailant. There was no testimony offered at the time of trial as to the origin of the sketch. Everyone appears to assume that Mrs. Buff's identification of the sketch led to Odom's arrest. It seems doubtful that the sketch was prepared from her limited description. Although the record indicates Odom had been arrested on previous occasions, one would ordinarily expect an arrest to produce a photograph rather than a sketch.

3. Detective Vaughn testified that, after the lineup, in response to a question from her father "if one of the five guys in the lineup was the person that had raped her," the victim stated "[I] think it was the one in the glasses." Defense counsel asked if her father was "leading her," and Vaughn replied, "No, he just told her he wanted her to be sure if it was the right man or not."

4. Petitioner, in an affidavit accompanying his brief in opposition to respondent's motion for summary judgment, alleged that all of the participants in the lineup were required to state before Mrs. Buff the reason they had been arrested and how long they had been confined; and that during the voice identification showup, Mrs. Buff's father repeatedly asked her "isn't he the one?" While these allegations do not appear to have been brought before the state trial court in its denial of petitioner's motion to suppress or before the state Appellate Court in affirming his conviction, the district court refused to conduct an evidentiary hearing, concluding that both sides had full opportunity to develop the facts during the state court proceedings and questioning whether a hearing some 5½ years after the events at issue would be illuminating. This decision was not in error. The constitutionality of the identification evidence was fully contested both at the evidentiary hearing and the trial and neither allegation was adverted to by petitioner in his testimony or inquired into on

## I.

Odom's primary claim here is that the pretrial identification procedures described above were unnecessarily and prejudicially suggestive and that, accordingly, the witnesses' testimony concerning these occurrences was improperly admitted and that the in-court identification of defendant by Mrs. Buff was irreparably tainted.

█ In *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967), the Supreme Court held that if a pretrial confrontation "was so unnecessarily suggestive and conducive to irreparable mistaken identification" as to deny due process of law, a habeas corpus petitioner challenging the admissibility of testimony concerning the pretrial confrontation and a subsequent in-court identification, would be entitled to his requested relief. The Court cautioned, however, that a determination of this issue turns upon "the totality of the circumstances" presented by the particular case. This court, in *United States ex rel. Kirby v. Sturges*, 510 F.2d 397, 402–03 (7th Cir. 1975), identified three interrelated aspects of the "totality of the circumstances" which must be considered in a case such as the present. First, the court must determine whether the police procedures at issue in the case were, in fact, suggestive. If such suggestiveness is found, the court must next consider whether any unusual or exigent circumstances existed which might, at least in part, have justified the use of the faulty procedures.[5] Finally, and most critically, the court must examine the reliability of the identification, in spite of the suggestive nature of the confrontation. It is clear that the reliability issue is the determining factor in this examination and unjustified, suggestive procedures may

be overborne when there are present sufficient indicia of reliability. *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

### A.

We have no doubt that the pretrial identification procedures utilized by the police in this case contained elements of suggestiveness, and that the fact that these procedures were consecutively applied increased the possible danger of misidentification.

█ First, on the day following the attack, the victim was shown a single sketch depicting a Black male and was asked whether "this resemble[s] the man." It is well established that "the display of pictures of [the suspect] alone [is] the most suggestive and therefore the most objectionable method of pre-trial identification." *Kimbrough v. Cox*, 444 F.2d 9, 10 (4th Cir. 1971). See also, *Mason v. United States*, 134 U.S.App. D.C. 280, 414 F.2d 1176, 1182 (1969); *Simmons v. United States*, 390 U.S. 377, 383, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1967). Even when the police refrain from expressly identifying the individual portrayed in the picture as the person *they* suspect as the criminal, compare *Palmer v. Peyton*, 359 F.2d 199, 200 (4th Cir. 1966), production of a single picture necessarily and implicitly suggests such a conclusion. *Kimbrough v. Cox, supra*, 444 F.2d at 10. While photographic identification undoubtedly provides an effective and useful investigatory tool, especially in cases such as the present where the crime is fresh and the perpetrator still at large, *Simmons v. United States, supra*, 390 U.S. at 384–85, 88 S.Ct. 967, 19 L.Ed.2d 1247, there can be no doubt that use of a single picture compromises much of this advantage

---

cross-examination of other participants. Moreover, there is some evidence in the record which can fairly be viewed as refuting the claims later asserted· in petitioner's affidavit. See, *e. g.*, note 3, *supra*. Considering the very full inquiry made before the state trial court, we are confident that if these assertions had been true they would have been made at the time.

5. While some cases have considered justification in examining the "totality of the circumstances," *Stovall v. Denno, supra*, it seems clear that exigent or unusual circumstances alone will not validate an otherwise unreliable identification resulting from a suggestive pretrial confrontation. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

with improper suggestion. *Id.* at 383, 88 S.Ct. 967.[6]

■ The following day, the victim viewed a lineup in the East St. Louis police station and selected Odom as her assailant. The police failed to preserve the event with photographs, see *United States ex rel. Pierce v. Cannon*, 508 F.2d 197, 201 (7th Cir. 1974), but the testimony at the hearing to suppress and during trial reveals the pertinent facts. Odom was the only person in the lineup to wear glasses, the outstanding feature of the assailant's appearance to the victim and an integral part of the description provided the police. Moreover, of the five men appearing, three were approximately six feet tall or taller while Odom's height was only 5 feet 5½ inches. Lineups in which suspects are the only participants wearing distinctive clothing or otherwise matching important elements of the description provided by the victim have been severely criticized as substantially increasing the dangers of misidentification. *United States ex rel. Pierce v. Cannon, supra*, 508 F.2d at 201, n. 5 and authority cited therein; *cf. Foster v. California*, 393 U.S. 440, 443 (1968). With respect to the matter of glasses, at least, and probably the variation in height as well, the lineup was suggestive for the purpose of the *Kirby* test.[7]

■ After the lineup was completed, Mrs. Buff was taken to an interrogation room for a one-to-one confrontation with Odom apparently in order to obtain a voice identification. During this confrontation, the victim heard the accused undergo questioning concerning his involvement in the crime. The utilization of voice identification processes may provide significant advantage to both law enforcement personnel and to an innocent suspect in criminal detection and investigation. As with lineup identification, however, the process should present the question of identification to the witness in as neutral a context as practicable. Where, as here, the victim heard the voice of a suspect after she had identified him by sight, it is probably less objectionable than if she had not yet identified him. But a more neutral process could well have been employed.

### B.

■ We next turn our consideration to whether any unusual or exigent circumstances justified the use of the suggestive procedures. *Kirby, supra.* The testimony reveals that the usual procedure of the East St. Louis police department in photographic identifications[8] was to present the witness with a group of pictures of different individuals. No justification has been offered to explain the abandonment of this procedure in favor of the single sketch. The sketch in question was shown to Mrs. Buff within hours of the attack. It has been held that face-to-face showups conducted immediately after the commission of a crime are justifiable. *United States v. Washington*, 158 U.S.App.D.C. 578, 447 F.2d 308, 311–12 (1970); *Bates v. United States*, 132 U.S.App.D.C. 36, 405 F.2d 1104, 1106 (1968). Insofar as these cases

---

6. The district court concluded that the fact that the victim was shown a "sketch" rather than a photograph somehow vitiated the suggestiveness. While the absence of a sketch from the record makes consideration of this point difficult, we do not agree. Mrs. Buff testified that the sketch was a representation of a particular man and, in fact identified that man as her assailant. The police immediately arrested petitioner. Under these circumstances, we conclude that the sketch served the same function as a photograph, and any suggestiveness that would be implicit with the use of one photo was also present here.

7. The state has pointed out that there is testimony that Odom asked to be permitted to keep his glasses on during the lineup and that, in any event, there is no evidence to indicate that the police in any way suggested or required it. We do not consider such facts determinative. The suggestiveness of the identification procedure results, not from police motive or misbehavior, but from the fact that Odom was the only lineup participant to be wearing glasses. *United States v. Wade*, 388 U.S. 218, 235, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1966). Compare *Coleman v. Alabama*, 399 U.S. 1, 6, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1969).

8. See note 6, *supra.*

concern exigency justification,[9] they stand for the proposition the requirement of a nonsuggestive identification process should not preclude eye witness, on-the-scene, identification when it is vitally important for the police to ascertain quickly, whether they have captured the right person or should continue their search while the criminal is still within easy reach. Such considerations are not present here. No appreciable time would have been lost by obtaining additional sketches or photographs to present to Mrs. Buff. But, *cf. United States v. Cox*, 428 F.2d 683, 686 (7th Cir. 1970), *cert. denied*, 400 U.S. 881, 91 S.Ct. 127, 27 L.Ed.2d 120.

Nor do we find any justification for the suggestive elements of the lineup. The suspect could have been required to remove his glasses or, in the alternative, similar glasses could have been supplied to the others in the lineup. *United States ex rel. Pierce v. Cannon, supra*, 508 F.2d at 201.

## C.

■ The existence of unjustified suggestive pretrial identification procedures does not resolve the question however. It is clear that the determinative factor is the reliability of the victim's identification. In reaching this issue, *Neil v. Biggers, supra*, provides the considerations: "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." 409 U.S. at 199–200, 93 S.Ct. at 382.

■ On consideration of these factors we conclude that Mrs. Buff's identifications of Odom were sufficiently reliable to avoid the due process challenge. The witness testified that, although the crime occurred in the early morning hours, there was sufficient light in her bedroom to permit her to see the intruder. The witness' degree of attention has not been seriously disputed. "She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes." *Neil v. Biggers, supra*, 409 U.S. at 200, 93 S.Ct. at 382. Her attacker was present for at least fifteen minutes and she described considerable conversation during that period.

Petitioner points out the general nature of the initial description Mrs. Buff provided the police and argues that this seriously compromises the reliability of her identifications. Experience teaches, however, that many persons may lack the ability to articulate a detailed description of a person they have seen and yet can still identify him on sight. Thus, the focus must be on inaccuracies rather than generality. Here the description was apparently accurate, although very general.

Petitioner also argues that the record displays some uncertainty in the witness' identifications at the various confrontations. Mrs. Buff testified that she was certain in her identification of the sketch and that she selected Odom in the lineup and recognized his voice at the showup. A police officer present at the lineup indicated that she was, at first, "reluctant" but did proceed to identify Odom as her assailant. The jury was thus presented with full accounts of the lineup by all the pertinent participants and was properly instructed to consider all the testimony presented, "considering the means of identification; the circum-

---

**9.** These cases are based upon considerations of reliability as well. "The ordinary on-the-scene confrontation also has great merit in that it operates at a time when the events and faces are fresh in mind and the accused ordi-narily has no opportunity to change his clothing or personal appearance." *United States v. Washington, supra*, 447 F.2d at 312. These considerations are included within the *Biggers* indicia of reliability.

stances under which he was identified; the opportunity for identifying the said defendant; the description of his apparel as stated by the witnesses; and the probabilities or improbabilities that it was the defendant." Under the facts of this case, we do not consider evidence of some initial reluctance, in the face of a substantial showing of later certainty of identification, to be dispositive since it may well reflect only a natural and proper reluctance to misidentify an innocent party. Here, we note that when Mrs. Buff was confronted with Odom at the voice identification showup, she stated that she was "sure" and became hysterical. Moreover, the confrontations all occurred within less than 48 hours after the assault. Thus, they operated at a time when the events and faces were fresh in the victim's mind and before her memory had been blurred by the passage of time.

The identification procedures employed in this case were suggestive in varying degree, and unnecessarily so. They are not condoned. The constitutional consideration here, however, is not police behavior but rather reliability of identification. While this case is close, we have carefully studied the testimony and conclude that there was no deprivation of due process.

## II.

 Petitioner also raises several additional claims. First, he argues that he was deprived of equal protection by the failure of the Illinois courts to dismiss the indictment against him for failure to comply with Ch. 38 Ill.Rev.Stats. § 103–5(a) (1971), which requires that every person in custody for an alleged offense shall be tried within 120 days of the date taken into custody unless delay is caused by the defendant. Interpretation of state statutory law is manifestly not a proper function for this court under its habeas corpus jurisdiction. *United States ex rel. Little v. Twomey*, 477 F.2d 767, 770 (7th Cir. 1973), *cert. denied*, 414 U.S. 846, 94 S.Ct. 112, 38 L.Ed.2d 94. We have carefully considered the record

and find no arbitrary or discriminatory refusal to apply the laws of the state to petitioner.

 It is also asserted that the failure of petitioner's counsel to appeal the issue of the alleged 120 day rule violation constituted a denial of effective assistance of counsel. There is no merit to this argument. The claim was presented to the State Appellate Court and rejected without comment. The record reveals that petitioner received representation throughout his state court proceedings far in excess of the "minimum professional standards" required by this court as effective assistance of counsel. *United States ex rel. Countee Williams v. Twomey*, 510 F.2d 634, 640 (7th Cir. 1975), *pet. for cert. filed*, 43 U.S.L.W. 3645 (June 5, 1975).

The judgment of the district court granting summary judgment to respondent and dismissing the writ is affirmed.