Carl DOOLEY, Petitioner–Appellant,

v.

Jack R. DUCKWORTH, Respondent–Appellee.

No. 86–1555.

United States Court of Appeals, Seventh Circuit.

Argued June 11, 1987.

Decided Oct. 30, 1987.

Janet M. Castonquay, Legal Asst., Michigan City, Ind., for petitioner-appellant.

Samuel L. Balinger, Asst. Atty. Gen., State of Ind., Indianapolis, Ind., for respondent-appellee.

Before WOOD, CUDAHY, and MANION, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Petitioner–Appellant Carl Dooley was convicted in Indiana state court of rape and burglary and sentenced to twenty years in prison. The conviction was affirmed by a divided Indiana Supreme Court. *Dooley v. State*, 428 N.E.2d 1 (Ind.1981). Dooley then filed a petition for a writ of habeas corpus in the District Court for the Northern District of Indiana, which was denied. Dooley now appeals that denial and raises two issues for our consideration: first, whether the factual findings of the Indiana Supreme Court are to be accorded a presumption of correctness, and second, whether the victim's in-court identification of Dooley is reliable, notwithstanding a suggestive pretrial lineup. We conclude that the Indiana Supreme Court's findings of facts are entitled to a presumption of correctness and that the in-court identification was reliable despite the suggestive lineup. The decision of the district court denying the petition for the writ of habeas corpus is affirmed.

## I. FACTUAL BACKGROUND

We take our statement of facts directly from the Indiana Supreme Court opinion:

On September 10, 1977 at around 11:00 p.m., D.D., the victim, was asleep at her residence on Fieldhouse Avenue in Elkhart [Indiana]. D.D., was awakened by a noise and walked into her living room to investigate. She saw a man standing at her back door. The man broke the door window, reached in, unlocked the door, and started to enter. D.D., slammed the door shut but the assailant pushed the door open and entered the house. D.D., ran into the kitchen where her attacker grabbed her and they struggled. D.D.,

broke free and switched on a light. She turned and faced her assailant, who was approximately four feet away. The man jumped at D.D., turned off the light, and forced her to the floor where he raped her. D.D. later identified the defendant as the rapist.

The defendant was singled out in a lineup by the victim on September 21, 1977, eleven days after the crime occurred. Prior to the first trial of this cause,[1] defendant filed a motion to suppress, asking that the victim's identification of defendant as the rapist be suppressed at trial. On April 19, 1978, the State stipulated that the lineup had been impermissibly suggestive. All evidence concerning the lineup and identification was suppressed. During the trial of the case at bar, the State asked D.D., to make an in-court identification of her assailant. The defense objected and a hearing was held outside the presence of the jury. When the jury returned, the victim was allowed to identify the defendant as the rapist.

. . . .

During the hearing, D.D., testified that she turned on a light and was able to see the defendant from a distance of four feet. The light was on for a few seconds. When the light was off, defendant was lying on top of D.D., face to face, for ten minutes. D.D., said her eyes adjusted to the darkness and she was able to determine that the rapist had a beard, though she was uncertain whether it was full or partial. When the defendant left, she saw him walk through her well lighted backyard. When the police arrived, D.D., described the rapist as a black male, 5'6" to 5'7", slender build, beard, and wearing a white T-shirt. On the stand, D.D., testified that the defendant was now heavier and had not been wearing glasses. After defendant took

1. At his first trial the defendant was convicted by a jury of rape and burglary. During final argument, however, the prosecutor had encouraged the jurors to draw negative inferences from the fact that defendant failed to call any witnesses who could testify to his whereabouts on the night of the crime. While the judge

sustained defendant's objection to this argument, he did not promptly admonish the jury to disregard it. On appeal the Indiana Supreme Court held that the failure to admonish the jury constituted reversible error and remanded the case for a new trial. *Dooley v. State*, 271 Ind. 404, 393 N.E.2d 154 (1979).

the stand he admitted that he had gained about forty pounds since the time of the initial arrest. He also said he did not always wear glasses and that they were not prescription lenses.

... She [D.D.] was alone with her assailant for 10–15 minutes in close proximity, much of the time face to face. D.D., saw her assailant both in the bright light of her dining room and her backyard. D.D., made no inaccurate identification of her assailant and has never failed to identify the defendant as her attacker. The only discrepancy is that one officer, Officer Loney, called to D.D.'s home, said she would not describe the defendant as "slender." The term "slender" is one open to many definitions and this comment has not affected the independent basis for identifying the defendant.

*Dooley*, 428 N.E.2d at 3, 4 (caption omitted).

## II. LEGAL STANDARDS

■ Defendant's primary argument is that D.D.'s in-court identification was so infected by the pretrial lineup, stipulated as suggestive by the State, that it violated principles of due process and should not have been allowed. Faced with such an argument this court's task is to determine, viewing the totality of the circumstances, whether the in-court identification is reliable despite the suggestive pretrial proce-

dure. *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972); *Love v. Young*, 781 F.2d 1307, 1311 (7th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 2923, 91 L.Ed.2d 551 (1986). The reliability of the identification is determined by an analysis of several factors which the United States Supreme Court set forth in *Biggers*. Those factors include

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382; *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).

■ Our review of these factors is a mixed question of law and fact. *Love*, 781 F.2d at 1311. Under this standard of review, as well as by statutory prescription, findings of subsidiary facts made by state courts are entitled to a presumption of correctness. *Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982) (*Sumner II*) (per curiam); 28 U.S.C. § 2254(d).[2] Thus in reaching our legal conclusion we are constrained to follow state court determinations of such fac-

---

**2.** The applicable statute, 28 U.S.C. § 2254(d), reads as follows:

(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record....

tual issues as whether the witness had an adequate opportunity to observe the defendant. *Sumner II,* 455 U.S. at 597, 102 S.Ct. at 1306; *Griswold v. Greer,* 712 F.2d 1200, 1204 (7th Cir.1983).

## III. DISCUSSION

### A. *Indiana Supreme Court's Findings of Fact*

As a preliminary matter, defendant contends the Indiana Supreme Court's factual findings should not be accorded the presumption of correctness required under 28 U.S.C. § 2254(d).[3] Under that statute there are eight circumstances in which the presumption does not apply. Defendant argues that the record does not "fairly support" the subsidiary fact that D.D. was able to observe her assailant and thus falls within the eighth statutory exception.[4] We do not agree.

The finding that D.D. observed her attacker finds support throughout the record, and is primarily predicated on three instances: when the assailant was in the bright light of D.D.'s living room at a distance of approximately four feet, when they were face-to-face during the rape for approximately ten minutes, and finally as the assailant exited through D.D.'s well-lit backyard.

Under direct and cross examination D.D. testified that she saw the attacker's face as he stood "frozen" for a moment in the bright light of her living room. D.D. also testified that she saw the attacker's face during the rape when they were face-to-face for approximately ten minutes. Although the rape occurred in a darkened room, D.D. testified that her eyes had adjusted to the darkness. Additionally, she testified that she observed the assailant as he walked from her house to an automobile, which was visible under the illumination of a street light. In light of this testimony we find it hard to understand the defendant's argument that the Indiana Su-

preme Court's factual finding that D.D. observed her assailant is not supported by the record.

Defendant contends, however, that D.D.'s description is too general to support the finding that she had an adequate opportunity to observe her assailant. While D.D.'s description of her attacker is phrased in general terms, there is no indication that any feature of the defendant other than his beard would warrant anything other than a general description. Defendant next asks a hypothetical question: If D.D. had adequate time to observe the attacker why did she express uncertainty at the time of the incident as to whether his beard was full or partial when it appears from a photo taken eleven days after the incident that the beard is unmistakably full? We can conceive of several possible explanations and are not limited to defendant's conclusion that D.D. obviously must not have seen her attacker clearly. It could be that the trauma of the event and the subsequent activity at her home involving her parents and several police officers distracted D.D., making it difficult for her to relate a fully detailed description of her attacker to the investigating officer. The discrepancy might also be attributed to the police officer who, upon noting D.D.'s emotional state, failed to press for a more accurate description. Perhaps D.D. did not fully understand what was being asked of her, or maybe she was unfamiliar with the various styles of men's beards. It does not seem unreasonable under the circumstances, in which the victim was under substantial emotional strain, that she was unable to fine-tune her description of the assailant.

Defendant also places great weight on statements made by the officer who took D.D.'s statement at the scene of the crime. This officer indicated in testimony reflecting her police report that the "victim was unable to get a good look at her attacker." The officer also stated, however, that D.D. made no such statement herself and that

---

**3.** Factual findings made by state appellate courts, such as the Indiana Supreme Court, are accorded the same statutory presumption as that accorded to state trial courts. *Sumner v.*

*Mata,* 449 U.S. 539, 546–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981) (*Sumner I*).

**4.** The eighth exception is set forth *supra* note 2.

the statement was merely based upon the police officer's impressions. The officer testified further that D.D. was hysterical. These facts indicate that D.D.'s inability to give a detailed description was because of emotional trauma, rather than a lack of observation.

The defendant's contentions do not show that the factual findings of the Indiana Supreme Court are not fairly supported by the record. Defendant does not demonstrate that the Indiana Supreme Court relied on events or statements not present in the record, or that that court's factual conclusions could not reasonably or logically follow from the evidence adduced at trial. By raising the arguments that he does, defendant seems to be asking us to reexamine the credibility of the witness, D.D., and come to a conclusion at odds with the factual conclusions reached by the Indiana Supreme Court. We do not sit as triers of fact. Our task is very limited. We determine only whether the record supports the Indiana Supreme Court's version of the facts. From our reading and understanding of the record we conclude that it does. Even if we were inclined to acknowledge that the defendant's contentions could find support in the record or that the record was ambiguous on the issue of observation, we would nevertheless be constrained to adopt the findings of the Indiana Supreme Court, which are fairly supported by the record. *See Wainwright v. Goode*, 464 U.S. 78, 85, 104 S.Ct. 378, 382, 78 L.Ed.2d 187 (1983) (per curiam) (federal court of appeals erred in substituting its view of the facts for that of the Florida Supreme Court where there were two possible factual conclusions, both finding fair support from an ambiguous record).

**B.  *Reliability of the In–Court Identification***

 Having determined that the facts as found by the Indiana Supreme Court are entitled to a presumption of correctness, we turn our attention to the defendant's second argument. Defendant maintains that the suggestive pretrial lineup so infected D.D.'s memory and perception of the events of September 10, 1977, that her ability to identify the attacker from her own recollection of that night was ruined. As previously mentioned, the focus of this court's inquiry is on the reliability of her in-court identification. In accord with the standard set forth in *Biggers* and *Manson* we must consider five key factors.

**1.  *Degree of Opportunity to View the Assailant***

The Indiana Supreme Court found that D.D. had in fact seen her assailant several times during the attack: at the backdoor before he entered the house, in her living room where the lights were on for a few seconds, during the ten minutes of the rape, and while the assailant was walking across the backyard. *See Dooley v. State*, 428 N.E.2d 1, 4 (Ind.1981).

**2.  *Degree of Attention***

Although the Indiana Supreme Court made no specific finding on this issue it is clear from the record that D.D. was not a casual observer but was attentive to her situation. Although D.D. expressed concern for the safety of her two-year-old son, who was in another room of the house, her testimony indicated that her full attention was on the attacker without distraction.

**3.  *Accuracy of the Description***

The Indiana Supreme Court found that "D.D. had made no inaccurate identification of her assailant." *Dooley*, 428 N.E.2d at 4. She described her attacker as black, 5'6" to 5'7", having a beard, and slender. This corresponds accurately with a description of Dooley. Dooley is black, 5'5", has a beard, and at the time of the incident weighed approximately 150 pounds. The only possible "inaccuracy" of this description involves the term "slender" which, as the Indiana Supreme Court commented, is open to many definitions. At this juncture we note that the focus of this inquiry is on the inaccuracies in the description and not its generality. *Israel v. Odom*, 521 F.2d 1370, 1375 (7th Cir.1975). In *Odom* we explained that the rationale for an inquiry

focusing on inaccuracies rather than generality is that "many persons may lack the ability to articulate a detailed description of a person they have seen and yet can still identify him on sight." *Id.* We previously have held that a description of a suspect as a "big man," when consistent with the suspect's physical makeup, was sufficient to meet the accuracy test. *Griswold v. Greer*, 712 F.2d 1200, 1204 (7th Cir.1983).

#### 4. Witness' Level of Certainty

The Indiana Supreme Court indicated that D.D. had never failed to identify the defendant as her attacker.[5] *Dooley*, 428 N.E.2d at 4. This consistency denotes a high level of certainty.

#### 5. Time Between the Crime and the Confrontation

The victim's confrontation with the defendant took place eleven days after the crime. *Dooley*, 428 N.E.2d at 3. This falls well within the outer limit of acceptable intervals between crime and confrontation. *See Neil v. Biggers*, 409 U.S. 188, 201, 93 S.Ct. 375, 383, 34 L.Ed.2d 401 (1972) (seven months between crime and first identification); *United States v. Goodman*, 797 F.2d 468, 471 (7th Cir.1986) (two months between incident and identification).

From the analysis of these five factors we believe that D.D.'s in-court identification was reliable despite the suggestive pretrial lineup.

### IV. CONCLUSION

We find no merit in defendant's claims and therefore affirm the judgment of the district court denying defendant's petition for writ of habeas corpus.

AFFIRMED.

CUDAHY, Circuit Judge, concurring in the result:

Although the habeas corpus rules apparently preclude me from disagreeing with the result, I certainly do not share the confidence with which the majority seems to reach its conclusion, for this case presents one of the most marginal identification scenarios I yet have encountered.

The majority asserts that the findings of the Indiana Supreme Court are fairly supported by the record. Yet the report of Officer Lorraine Loney, who investigated the crime, stated in her report made on the night of the attack that during the brief time the light was on the rape victim "was unable to get a good look at [her assailant]." In her pretrial deposition, the victim claimed she had only "a few seconds" in the light of her dining room to view the perpetrator from a distance of four feet. The term "a few seconds" was clarified by the victim at trial almost two years later to mean "ten seconds."

Quite mysteriously, two out of five justices of the Indiana Supreme Court dissented from the affirmance of the conviction on direct appeal in considerable measure because the victim was allegedly unable to identify Dooley at a first line-up prior to the stipulated suggestive second line-up. The majority here says—apparently correctly—that the "first" line-up involved a different victim and another alleged rape. Yet the Indiana Supreme Court never responded to the version of events upon which the dissenters based their view.

Under the rules we are required to follow in habeas corpus cases, I cannot say the facts that majority relies on are clearly wrong. The evidence here, however, is anything but "clear and convincing" and the outcome—our approval of a conviction

---

5. The dissenting opinion of the Indiana Supreme Court mentions two pretrial lineup procedures in which both D.D. and the defendant participated. *Dooley*, 428 N.E.2d at 7 (Hunter, J., dissenting). According to the dissent D.D. could not identify the defendant at the first lineup. A few hours later defendant was placed in a second lineup, the one stipulated as suggestive, at which time D.D. identified him as her attacker. Our review of the record, however, fails to disclose any support for the existence of two lineups involving D.D. The record does indicate that the defendant was placed in a lineup involving another rape and a different victim, who did not identify him, prior to his participation in the suggestive lineup. D.D. took no part in this lineup. Without D.D.'s involvement the prior lineup centering on the defendant and a third party is immaterial to the resolution of this case.

and resulting twenty-year sentence based on such an unreliable identification—is certainly troubling.