SECOND DIVISION

MARCH 31, 1999

1-97-1069

THE PEOPLE OF THE STATE OF ILLINOIS, ) ON APPEAL FROM THE

) CIRCUIT COURT OF

Plaintiff-Appellee, ) COOK COUNTY

)

v. ) No. 94-CR-21169

)

REGINALD KELLEY, ) THE HONORABLE

) JOSEPH J. URSO,

Defendant-Appellant. ) JUDGE PRESIDING.

JUSTICE COUSINS delivered the opinion of the court:

On August 29, 1994, defendant, Reginald Kelley, was charged by indictment No. 94-CR-21169 with two counts of first degree murder, armed violence, attempt (first degree murder), aggravated battery with a firearm, aggravated discharge of a firearm and three counts of aggravated battery.  Following a bench trial, defendant was found guilty of first degree murder, attempt (first degree murder) and armed violence.  The trial court ordered the remaining aggravated battery and aggravated discharge counts to merge with the attempt (first degree murder) count.  Thereafter, the trial court sentenced defendant to an 80-year extended-term sentence for the first degree murder charge, to be served consecutive to a 20-year sentence for the attempt first degree murder charge, totalling 100 years' imprisonment in the Illinois Department of Corrections.  Defendant appeals from both his convictions and sentences, contending that:  (1) he was denied effective assistance of counsel where counsel failed to investigate evidence and interview witnesses, failed to file a motion to suppress identification evidence, and conceded defendant's guilt in closing argument; and (2) the trial court abused its discretion at the sentencing hearing by allowing the transcript of the grand jury proceedings to be admitted in aggravation without the benefit of cross-examination and thereafter sentencing defendant to an excessive term.

BACKGROUND

The evidence presented at trial indicated that on July 25, 1994, at approximately 10:30 p.m., Ebony Collins, her three-year-old son Kevin Taylor, Jr. (K.T.), her father Ronnie Cole, her friend Lashon Johnson, and her brother Ronnie Collins were gathered at Ms. Collins' mother's house, located on Exchange Street in the southeast side of Chicago, Illinois.  The group decided to drive to a grocery store located at 79th Street and Yates Boulevard in a white Chevy Caprice.  K.T. sat in between Ms. Collins and Mr. Cole in the front seat, while Mr. Collins sat behind Ms. Collins and Ms. Johnson sat behind Mr. Cole.  K.T.'s head was visible over the front seat from the neck up.

After leaving her mother's house, Ms. Collins drove southbound on Yates Boulevard to 79th Street.  Ms. Collins and Ms. Johnson went into the store, purchased some items and returned to their respective seats in the car.  Thereafter, Ms. Collins pulled out onto Yates Boulevard and proceeded northbound to 75th Street, where she stopped the car for a red light.  As the vehicle was stopped, Ms. Collins, Mr. Collins and Mr. Cole noticed a group of approximately six people standing on the northeast corner, approximately 25 feet away.  Ms. Collins and Mr. Cole noticed a boy whose hair was in french braids and who was wearing red shorts and a white T-shirt with stripes on the sleeve staring at the car.  The boy in the red shorts and another boy dressed in dark clothes broke away from the group and crossed the street in front of the car, walking toward the northwest corner.  While crossing the street and still staring at the car, the boy in the red shorts began lifting up his shirt in the area of his waistband.

The light turned green and Ms. Collins began to drive through the intersection.  Ms. Collins and Mr. Collins noticed the boy in the red shorts throw gang signs in the air.  When the car was approximately 10 feet away from the boy, Ms. Collins heard someone through the open driver's side car window say, "Ain't that the motherfucking car right there?"  At the same time, Mr. Collins saw the face of the boy in the red shorts and both Mr. Collins and Ms. Johnson watched the boy "fiddle with his shirt," revealing a black object tucked in the waistband of his shorts.  The car was approximately 50 feet away from the boys when Ms. Johnson saw the right arm of the boy in the red shorts extend to a 90-degree angle and further saw three flashes exit from where his arm was extended.  Ms. Collins, Mr. Collins and Ms. Johnson heard three gunshots, which they described as sounding like a car backfiring; Mr. Cole heard approximately two shots.  Then, the back windshield shattered.  Mr. Cole yelled that he had been hit and K.T. began to cry.  Ms. Johnson saw blood on Mr. Cole's arm and, when K.T. was lifted up, she saw blood from K.T.'s head.  Mr. Collins saw two holes in his father's arm and a hole in the back left side of his nephew's head.  Ms. Collins looked at K.T. and saw that he had been shot in the back of the head.  She then became hysterical and Mr. Cole told her to let Mr. Collins drive them to the hospital.  

Once at Jackson Park Hospital, Mr. Cole was treated for multiple gunshot wounds.  After being transferred from Jackson Park Hospital to Wyler's Hospital, K.T. died from a single gunshot wound to the head.  That same evening, police officers recovered three .9 millimeter cartridge cases from the driveway of the Amoco gas station and three more were found in the street next to the curb, approximately 10 to 12 feet from the parkway next to the driveway.

On July 29, 1994, Officer James Oliver picked up Ms. Collins and her sister Melissa in a green Jeep Cherokee with dark tinted windows.  The three drove to the Gatlings Funeral Home, located at 102nd Street and Halsted Avenue, and parked across the street, approximately 50 to 75 feet from the entrance.  Approximately 200 to 300 people, from ages 16 to 26, were present.  The people were predominantly young black men of various heights, weights, hairstyles and clothes.  After 15 or 20 minutes, Ms. Collins identified defendant and Jernel Brown as two of the boys present on July 25, 1994.  Defendant was wearing a white T-

shirt, black pants and gym shoes with red shoestrings, and his hair was in french braids.  Ms. Collins recognized defendant's face, and both she and Officer Oliver identified defendant in open court as the boy Ms. Collins identified at the funeral home.  

At Gatlings Funeral Home, on July 24, 1994, Officer Oliver called for assistance and Officer Edward Sonne, along with his partner, responded.  As Officer Sonne exited his car and began to approach defendant, defendant began walking away.  Officer Sonne asked defendant to stop, which he did, and the officer did a protective patdown of defendant, recovering a loaded .25-caliber semiautomatic handgun from defendant's right pants pocket.

On August 2, 1994, at approximately 2 p.m., Ms. Collins and Mr. Cole viewed the same lineup at Area 2 police headquarters, both consisting of seven black males in their late teens or early twenties, all with dark complexions.  The participants in the lineup were approximately 5 feet 8 inches to 6 feet tall.  Additionally, three of the participants had braided hair.  Ms. Collins identified defendant and Mr. Brown; Mr. Cole was unable to identify anyone.  On that same day, at approximately 6:15 p.m., Mr. Collins viewed a similar lineup with Detective John Ervin.  Mr. Collins identified defendant as the boy staring at the car; he identified him again in open court during the trial.  Mr. Collins only tentatively identified Mr. Brown as the boy in the dark clothes.  On August 11, 1994, Ms. Johnson viewed a similar lineup prepared by Detective Ervin; however, Mr. Brown was unable to participate.  Ms. Johnson also identified defendant.

Assistant State's Attorney (ASA) Peter Faraci of the felony review unit testified that, on August 2, 1994, he was assigned to the murder of K.T.  At approximately 5:05 p.m., he went to an interview room where defendant was present with Detective Ervin.  ASA Faraci introduced himself and recited to defendant his 
Miranda 
rights from memory.  After indicating that he understood his rights as recited, defendant waived his rights and wanted to speak.  Defendant informed ASA Faraci that, on July 25, 1994, at approximately 10:45 p.m., he was either at his aunt's house or with friends in the alley hanging out.  Two days prior, his cousin, Brian Hill, a "Black P Stone" gang member, was shot and killed in a drive-by shooting by a "GD," a rival gangmember.  Defendant also stated to ASA Faraci that he was also a "Black P Stone" gangmember.  Defendant further stated to ASA Faraci that he believed that the drive-by shooting incident involved a light-

colored or white, four-door Chevy.  However, he denied knowledge of the location or facts relating to K.T.'s homicide.

ASA Catherine Hufford testified that, on August 3, 1994, at approximately 8 p.m., defendant was brought to the felony review room in Area 2 police headquarters to speak with her.  She introduced herself and recited to defendant his 
Miranda 
rights from memory.  After indicating that he understood his rights as recited, defendant again waived his rights and wanted to speak.  Defendant originally told ASA Hufford that he was a "Blackstone" or "Stone" gangmember and that the Blackstones were at war with the Gangster Disciples over "turf."  He further stated that his cousin, Brian Hill or "Ibir," was killed by a Gangster Disciple on July 23, 1994, and his friend Alina was shot in the same incident.  Defendant denied being at 75th Street and Yates Boulevard at the time of the murder.  Rather, he asserted that he was at his aunt's house at 6725 South Clyde Street at approximately 10:30 p.m. the night of the murder, smoking 
reefer and drinking.  Defendant stated his uncle "Rocks" came out to get him, saw what he was doing and let him stay outside; however, defendant would not provide "Rocks' " real name, address or telephone number.  Defendant further stated that his uncle Kash was visiting from Wisconsin and could verify his presence.  He then provided ASA Hufford a telephone number to contact Kash.

ASA Hufford asked defendant if he was worried that the .25- caliber gun recovered by police officers on July 29, 1994, was used in the shooting.  Defendant responded, "No because I didn't have no nine millimeter."  ASA Hufford replied, "Who said it was a nine millimeter?"  After indicating that ASA Hufford told him the caliber of the weapon, to which she replied that she had not, defendant stated, "I should have listened to my mother and kept my mouth shut.  I don't want to talk to you no more."  Defendant was then escorted out of the room.

Following the aforementioned testimony from the State's witnesses, the parties entered into a stipulation that Dr. Robert Kirschner, the medical examiner, would testify that K.T. died of severe cerebral injuries secondary to the single gunshot wound to the head.  The parties further stipulated that a forensic expert by the name of Mr. Warner would testify that the bullet fragment removed from K.T.'s head was not suitable for comparison and, thus, he would be unable to testify as to its specific caliber.  The State rested and the trial court granted defendant's motion for a directed verdict as to count VIII, aggravated battery based upon the permanent disfigurement of Mr. Cole.

Defendant presented four witnesses to corroborate defendant's alibi:  Kash Tahmir, Enewamah Tahmir, Melissa Williams and Angela Egeston.  Additionally, Detective Jack Hines was called to impeach Ms. Collins' testimony that police officers only asked her what the perpetrators were wearing when they arrived at the hospital on July 25, 1994, to question her.

On December 16, 1996, following closing argument, the trial court found defendant guilty of first degree murder, attempt (first degree murder) and armed violence.  The trial court further ordered the remaining aggravated battery and aggravated discharge counts to merge with the attempt (first degree murder) count.  

On February 20, 1997, after hearing and considering the presentence report, the arguments, the evidence and the factors presented in aggravation and mitigation, the trial court sentenced defendant to an 80-year extended term sentence for the first degree murder charge, to be served consecutive to a 20-year sentence for the attempt (first degree murder) charge, totalling 100 years' imprisonment in the Illinois Department of Corrections.  Defendant appeals from his convictions and sentences.

We affirm.

OPINION

I

Defendant contends that he was denied his sixth amendment right to effective assistance of counsel where counsel failed to investigate evidence and interview witnesses, failed to file a motion to suppress identification evidence, and conceded defendant's guilt in closing argument.  It is well established in Illinois that the "benchmark" in determining whether there has been ineffective assistance of counsel is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result."  
Strickland v. Washington, 
466 U.S. 668, 686, 80 L. Ed. 2d 674, 692-93, 104 S. Ct. 2052, 2064 (1984); 
People v. Albanese, 
104 Ill. 2d 504, 525, 473 N.E.2d 1246, 1255 (1984).

The court in 
Strickland 
announced a two-part test for judging ineffective assistance of counsel claims.  Under that test, a defendant must show that: (1) counsel's representation fell below an objective standard of reasonableness and the shortcomings of counsel were so severe as to deprive defendant of a fair trial; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.
  Strickland, 
466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; 
Albanese, 
104 Ill. 2d at 525, 473 N.E.2d at 1255.  Defendant bears the heavy burden of overcoming a strong presumption in favor of finding that counsel's advocacy was not ineffective.  
Albanese, 
104 Ill. 2d at 526, 473 N.E.2d at 1255.  Specifically, t
he 
defendant must show that his counsel made errors so serious, and his performance was so deficient, that he was not functioning as the counsel guaranteed the defendant by the sixth amendment to the United States Constitution, and that these deficiencies so prejudiced the defendant as to deprive him of a fair trial whose result is reliable.  
People v. Caballero, 
126 Ill. 2d 248, 259-60, 533 N.E.2d 1089, 1091 (1989).  
Moreover, 
the reasonableness of trial counsel's actions must be evaluated from counsel's perspective at the time of the alleged error, without hindsight, in light of the totality of the circumstances and not just on the basis of isolated acts.
  Albanese, 
104 Ill. 2d at 525, 473 N.E.2d at 1255.  On review, this
 
court will not extend its inquiry into areas involving the exercise of judgment, discretion, or trial tactics.  
People v. Truly, 
230 Ill. App. 3d 948, 952, 595 N.E.2d 1230, 1233 (1992).

A

As the facts indicate, on July 29, 1994, Officer Oliver picked up Ms. Collins and her sister, Melissa, and drove to the Gatlings Funeral Home.  After 15 or 20 minutes, Ms. Collins identified defendant as being present at the shooting and, at trial, she indicated that she recognized defendant's face as she had seen him in the neighborhood.  On August 2, 1994, Ms. Collins viewed a lineup prepared by Detective Ervin wherein she, again, positively identified defendant.  Defendant, however, contends that he was denied his right to effective assistance of counsel where trial counsel failed to investigate and interview Ms. Collins' sister, Melissa, concerning any assistance she provided her sister in identifying defendant at the funeral home.  

In order to prevail on an ineffective assistance of counsel claim based on the failure of counsel to investigate, defendant must show that substantial prejudice resulted and there was a reasonable probability that the final result would have been different had counsel properly investigated.  
People v. Kluppelberg, 
257 Ill. App. 3d 516, 527, 628 N.E.2d 908, 917 (1993).  A reasonable probability is a probability sufficient to undermine the outcome.  
Strickland, 
466 U.S. at 694, 80 L.Ed.2d at 699, 104 S.Ct. at 2068.  The failure to investigate alone can constitute ineffective assistance if it was prejudicial and did not conform to minimal professional standards.  
People v. Witherspoon, 
55 Ill. 2d 18, 21-22, 302 N.E.2d 3, 5 (1973).  Failure of counsel to investigate a defense properly may indicate actual incompetence and whether counsel's failure to investigate amounts to ineffective assistance depends upon the value of the evidence and the closeness of the case.  
Kluppelberg, 
257 Ill. App. 3d at 527, 628 N.E.2d at 917.  

Here, defendant relies on 
People v. Truly, 
230 Ill. App. 3d 948, 595 N.E.2d 1230 (1992), in support of his contentions.  However, in our view, 
Truly 
is inapposite.  In 
Truly, 
the defendant was convicted of robbery and, on appeal, contended that his trial counsel was ineffective where he failed to investigate, prepare and present his alibi.  This court held that where trial counsel failed to contact and secure witnesses that could have provided the defendant with an alibi and, further, where counsel failed to investigate and develop a plausible defense theory, defendant was prejudiced and his counsel's actions were thereby ineffective.  
Truly, 
230 Ill. App. 3d at 955-56, 595 N.E.2d at 1235.

The case 
sub judice 
is unlike 
Truly 
in that there is no record of any complained-of omission by trial counsel.  Instead, defendant relies on a supplemental police report that is not contained within the record, along with unsupported statements by the defendant, in order to argue that counsel did not interview Melissa and that Melissa somehow "coached" Ms. Collins into identifying defendant.  In such a case, defendant cannot establish either prong of the 
Strickland 
test.  Although the failure to contact witnesses may have a serious impact on the outcome of a case, as illustrated in 
Truly, 
defendant here adduced no evidence as to whether trial counsel made any efforts to locate or interview Melissa.  Because Melissa did not testify, defendant asks this court to infer that counsel neither investigated nor interviewed.  We can draw no such inference from the record, especially where Melissa was not a witness to the shooting.  See 
Kluppelberg, 
257 Ill. App. 3d at 527, 628 N.E.2d at 917.  Additionally, two other witnesses positively identified defendant from lineups and in open court as the boy in the red shorts with french braids.

Defendant further contends that he was denied effective assistance of counsel where trial counsel's failure to investigate evidence concerning the caliber of the bullet removed from K.T.'s head during the postmortem examination was coupled with the inappropriate stipulation to the ballistics evidence and corresponding medical examiner testimony.  Again, there is no evidence in the record that trial counsel failed to either interview Dr. Kirschner or investigate the evidence concerning the caliber of the bullet.  Instead, defendant points this court to evidence of an autopsy report that is not contained in the record.  

In our view, the evidence does not support a holding that defendant was denied effective assistance of counsel.  See 
Kluppelberg, 
257 Ill. App. 3d at 527, 628 N.E.2d at 917.  Moreover, a medical examiner is not qualified to testify as to ballistics' testimony.  
Cf. People v. Babiarz, 
271 Ill. App. 3d 153, 160, 648 N.E.2d 137, 143 (1995).

B

Defendant next contends that he was denied effective assistance of counsel where trial counsel failed to file a motion to suppress suggestive and unreliable identification evidence.  Specifically, defendant posits several suggestive features of his lineup identifications:  (1) Ms. Collins misidentified defendant at the funeral home; (2) defendant wore the same clothes in the lineups that he did at the funeral home for all of the lineups; (3) defendant's hair was braided the same as it was at the funeral home for the lineups shown on August 2, 1994; and (4) defendant was the only participant in the lineup shown on August 11, 1994, with a large Afro hairstyle, leading to the inference that his hair was the only hair that could have been braided.  However, in order to prevail on a claim that his trial counsel was ineffective for failing to file or pursue a motion to suppress evidence, defendant bears the burden of showing that the motion would have been granted (
People v. Bennett, 
222 Ill. App. 3d 188, 201, 582 N.E.2d 1370, 1379 (1991)) and that the trial outcome would have been different if the evidence had been suppressed.  
Bennett, 
222 Ill. App. 3d at 203, 582 N.E.2d at 1381.  Moreover, defense counsel is not required to make losing motions or objections in order to provide effective legal assistance.  
People v. McCarthy, 
213 Ill. App. 3d 873, 886, 572 N.E.2d 1219, 1228 (1991).

In order to prevail on a motion to suppress, our supreme court has indicated that the defendant must first establish that the complained-of pretrial identification procedure was unnecessarily suggestive and that the evidence would have been suppressed absent a showing of clear and convincing evidence by the State that an independent basis of reliability existed for the identification.  
People v. Garcia, 
97 Ill. 2d 58, 73, 4554 N.E.2d 274, 279 (1983).  Reliability is the "linchpin" in the determination of whether identification testimony should be admitted.  
People v. Morissette, 
150 Ill. App. 3d 431, 438, 501 N.E.2d 781, 786 (1986).  The factors relevant to this determination include:  (1) the witness' opportunity to view the suspect at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the suspect; (4) the level of certainty demonstrated at the time of the confrontation; (5) the length of time between the crime and the confrontation; and (6) any acquaintance with the suspect prior to the crime.  
Neil v. Biggers, 
409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382 (1972); 
accord People v. Bryant, 
94 Ill. 2d 514, 520-21, 447 N.E.2d 301, 304 (1983).  These elements of reliability are to be weighed against the corrupting effects of the alleged suggestive identification (
Morissette, 
150 Ill. App. 3d at 438, 501 N.E.2d at 786) and each case must be considered on its own facts 
based 
on the totality of the circumstances.  
Stovall v. Denno, 
388 U.S. 293, 302, 18 L. Ed. 2d 1199, 1206, 87 S. Ct. 1967, 1972 (1967).  

Exigent or unusual circumstances alone will not validate an otherwise unreliable identification resulting from a suggestive pretrial confrontation.  
Isreal v. Odom, 
521 F.2d 1370, 1373 (7th Cir. 1975).  Nonetheless, even if the identifications were found to be unjustified or suggestive, such procedures may be overborne when there are present sufficient indicia of reliability.  
Isreal, 
521 F.2d at 1373.  As such, if the State can prove by clear and convincing evidence that the identifications had an independent origin in the witnesses' memories of events at the time of the crime, the identifications may still be admissible.  
People v. Richardson, 
123 Ill. 2d 322, 350, 528 N.E.2d 612, 622 (1988).

In the case 
sub judice, 
defendant's contentions regarding the suggestive features of Ms. Collins' initial identification are not persuasive.  Ms. Collins had an opportunity to view defendant prior to the shooting as her vehicle was stopped at the intersection for a red light, and she testified in specific detail regarding what defendant was wearing, what she heard him say as the car passed, and where defendant was located both before and after the shooting.  Ms. Collins demonstrated a good level of certainty that defendant was the shooter both at the initial identification and later at the lineup, and she testified that she had seen defendant around the neighborhood and knew his face.  Therefore, in applying the aforementioned analysis to the instant case, in our view, there is sufficient indicia of reliability of Ms. Collins' initial identification of defendant at the funeral home to permit its admission into evidence.

Defendant's contentions regarding the lineup identifications are similarly unpersuasive.  It must be noted that participants in a lineup need not be physically identical (
People v. Thompson, 
93 Ill. App. 3d 995, 1007, 418 N.E.2d 112, 122 (1981)); therefore, defendant's hairstyles in the lineups (both the french braids and the Afro) were not so distinctive that they rendered the lineups unduly suggestive.  See 
Richardson, 
123 Ill. 2d at 350, 528 N.E.2d at 622.  Additionally, the fact that defendant was dressed as he was at the time of the initial identification does not, in and of itself, render the lineup identification unduly suggestive.  See 
Morissette, 
150 Ill. App. 3d at 437, 501 N.E.2d at 785.  Rather, differences in the appearance of defendant and other lineup participants go to the weight of the evidence, not its admissibility.  
People v. Trass, 
136 Ill. App. 3d 455, 463, 483 N.E.2d 564, 573 (1985).

Assuming, 
arguendo, 
that any of the pretrial identification procedures were impermissibly suggestive, defendant would not have prevailed on a motion to suppress where there were three trial witnesses who testified that they had independent bases for their identifications, thereby removing any risk of misidentification.  See 
Richardson, 
123 Ill. 2d at 350, 528 N.E.2d at 622; see also 
Morissette, 
150 Ill. App. 3d at 437-38, 501 N.E.2d at 786.  Accordingly, defendant has not met his burden of showing that trial counsel was ineffective for failing to file a motion to suppress where, in our view, such a motion would not have been granted and the outcome would not have been different had the identifications been suppressed.  See 
People v. Bennett, 
222 Ill. App. 3d 188, 582 N.E.2d 1370 (1991).

C

Defendant also contends that he was denied effective assistance of counsel where, during closing argument, trial counsel stated, "we don't expect you to find [defendant] innocent, that's not one of your choices and that's not anything we're asking for."  In support of his contention, defendant relies on 
People v. Hattery, 
109 Ill. 2d 449, 488 N.E.2d 513 (1985).  
Hattery, 
however, is distinguishable from the case at bar.

In 
Hattery, 
without applying the 
Strickland 
test, our supreme court held that a defendant's sixth amendment right to effective assistance of counsel was violated when, in his opening statement to the jury, one of defendant's attorneys stated:

" 'Ladies and gentlemen of the jury, [defendant] did it.  He did everything [the prosecution] just told you. ***

We are not asking you to find [defendant] not guilty.  At the end of your deliberations, you will find him guilty of murder. *** The question, and the only question facing you, will be whether to impose the death penalty on [defendant] for trying to save the life of his family.' "   (Emphasis omitted.)  
Hattery, 
109 Ill. 2d at 458-49, 488 N.E.2d at 516.

Defense counsel in 
Hattery 
presented no evidence at trial and did not make a closing statement to the jury.  Through cross-examination of the State's witnesses, defense counsel attempted to develop the theory that the defendant was compelled to kill the victims.  Additionally, defense counsel conceded defendant's guilt several times throughout trial.  Consequently, our supreme court held that defense counsel's actions had violated the defendant's sixth amendment right " 'of [having] the issue of his guilt or innocence presented to the jury as an adversarial issue.' "  
Hattery, 
109 Ill. 2d at 463, 488 N.E.2d at 518.

The case at bar is distinguishable from 
Hattery 
in that defense counsel not only answered the State's presentation of law and facts (
People v. Carter, 
41 Ill. App. 3d 425, 429, 354 N.E.2d 482, 485 (1976)), but also adamantly attacked the sufficiency of the evidence throughout the entire trial.  Whereas trial counsel in 
Hattery 
presented no evidence at trial, here, trial counsel presented four witnesses to support defendant's alibi.  Whereas trial counsel in 
Hattery 
did not make a closing argument, here, trial counsel maintained that the State had not met its burden throughout his closing argument.  Whereas trial counsel in 
Hattery 
conceded defendant's guilt throughout trial, here, trial counsel vigorously contested defendant's guilt throughout the trial.

Based on the aforementioned dissimilarities with 
Hattery, 
we agree with the State's position in its brief that "the portion of defense counsel's closing argument that defendant chose to attack is merely a statement about the ultimate finding that the court need not determine that defendant was innocent, rather that the [State] had not proven him guilty beyond a reasonable doubt."

Perhaps defendant equates "innocent" with "not guilty."  However, the two are not synonymous and, in a bench trial, the court is presumed to know the law and this presumption may only be rebutted when the record affirmatively shows otherwise.  
People v. Bowden, 
241 Ill. App. 3d 608, 621, 609 N.E.2d 346, 357 (1993).  Moreover, a trial court is presumed to recognize and disregard improper arguments presented to it and consider only competent evidence in ruling on the merits.  
Bowden, 
241 Ill. App. 3d at 622, 609 N.E.2d at 357.

In our view, defendant has failed to meet his burden under either prong of the 
Strickland 
test in his allegations of ineffective assistance of counsel.  Accordingly, we hold that defendant was not denied effective assistance of counsel for any of the reasons articulated on appeal.

II

Defendant finally contends the trial court abused its discretion at the sentencing hearing by allowing the transcript of the grand jury proceedings to be admitted in aggravation without the benefit of cross-examination and, thereafter, sentencing defendant to an excessive term.  Our supreme court has indicated in both 
People v. Reed, 
177 Ill. 2d 389, 686 N.E.2d 584 (1997), and 
People v. Enoch, 
122 Ill. 2d 176, 522 N.E.2d 124 (1988), that a written postsentencing or posttrial motion is required to preserve trial error on review in order to

"allow the trial court the opportunity to review a defendant's contention of sentencing error and save the delay and expense inherent in appeal if they are meritorious.  Such a motion also focuses the attention of the trial court upon a defendant's alleged errors and gives the appellate court the benefit of the trial court's reasoned judgment on those issues."  
Reed, 
177 Ill. 2d at 394, 686 N.E.2d at 586.

See also 730 ILCS 5/5-8-1(c) (West 1994) ("A defendant's challenge to the correctness of a sentence or to any aspect of the sentencing hearing shall be made by a written motion filed within 30 days following the imposition of sentence").  In failing to file a written postsentencing motion with the trial court, as required, defendant has waived any sentencing issues on appeal.  
Reed, 
177 Ill. 2d at 393, 686 N.E.2d at 586; 
Enoch, 
122 Ill. 2d at 186, 522 N.E.2d at 1129.  Additionally, we note that the maximum extended-term sentence for first degree murder is 100 years and that the extended term of 80 years imposed for the first degree murder in the instant case was within the sentencing limits.  

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

GORDON, P.J., and RAKOWSKI, J., concur.