2021 IL App (1st) 190023-U
Order filed January 29, 2021

Fifth Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 19879 |
| | ) | |
| KENNETH ROBINSON, | ) | Honorable |
| | ) | James M. Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Delort and Justice Cunningham concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the judgment of the circuit court where the evidence at trial was
sufficient to show that defendant shot the victim, who testified that he had known
the defendant for four years at the time of the shooting, reflected high indicia of
reliability, and was closely corroborated by the other witnesses. The trial court did
not err in denying the defendant's motion to suppress identification.

¶ 2    Following a bench trial, the defendant Kenneth Robinson was found guilty of six counts of

attempt first degree murder and one count of aggravated battery. The trial court merged the counts

into a single count of attempt first degree murder and sentenced the defendant to 31 years'

imprisonment which included a 25-year firearm enhancement. On appeal, the defendant argues that the State failed to prove him guilty of attempt first degree murder. Alternatively, he asserts that the trial court erred in denying his motion to suppress his identification by the victim, where the pretrial identification procedures were "unnecessarily suggestive" and tainted the identification of him as the offender. We affirm.

¶ 3        The defendant was charged by indictment with six counts of attempt first degree murder (720 ILCS 5/8-4(a) (West 2014); 720 ILCS 5/9-1(a)(1) (West Supp. 2015)), one count of aggravated battery (720 ILCS 5/12-3.05(e)(1) (West Supp. 2015)), and two counts of aggravated kidnaping (720 ILCS 5/10-2(a)(6) (West Supp. 2015)), following the shooting of Adam Simpson in Chicago on November 22, 2015.

¶ 4        At trial, Vernon Hamilton testified that on November 21, 2015, at about 10:30 p.m., he and his brother Quinton Hamilton drove Vernon's car to a club on 124th Street and Racine Avenue to celebrate Vernon's birthday.[1] There, they joined Simpson,[2] and the defendant arrived at about 11 p.m. The Defendant is the brother of Quinton's girlfriend, and Vernon had known the defendant for about seven years.

¶ 5        There were no disagreements in the club, and they left around 2:30 a.m. The defendant and Simpson asked Vernon to drive them home, and Vernon agreed. Vernon sat in the driver's

_____

[1] Because Vernon Hamilton has the same last name as Quinton Hamilton, we refer to both by their first names. The trial transcript spells Quinton Hamilton's first name as both "Quintin" and "Quinton," but the parties do not dispute these two names refer to the same person.

[2] While the trial transcript alternately spells the victim's last name as "Simpson" and "Simson," the parties do not dispute that these two names refer to the same person.

seat, Quinton sat in the front passenger's seat, the defendant sat behind Vernon, and Simpson sat behind Quinton.

¶ 6     Vernon stated that he first drove towards Simpson's house at the intersection of 109th Street and State Street.  About five minutes from Simpson's house, Vernon heard the defendant and Simpson arguing in the back seat. Vernon stopped his vehicle directly in front of Simpson's house. Simpson exited the vehicle onto the street and walked towards his house, and the defendant exited out of the same door. Simpson stated, "[D]on't be pulling a gun out on me like that." Vernon turned around, heard two gunshots, and saw the defendant standing in the street close to the vehicle and holding a silver firearm. The defendant jumped back in the vehicle, aimed the firearm at Vernon's head, and told him to "pull off." Vernon drove down the street and around a corner, where the defendant told him to stop the vehicle. Vernon complied, and the defendant jumped out and ran away. Vernon drove to his own home, which was five minutes away, and called Simpson's friend to tell him what happened. He did not call the police because he was "scared" and "traumatized." Vernon identified the defendant in court and confirmed that the defendant was depicted in a photograph entered into evidence as People's Exhibit No. 1.

¶ 7     On cross-examination, Vernon confirmed that his nickname is "Vino." He considered Simpson a close friend and had known Simpson for six years, but told the grand jury that he had known Simpson for eight years. On the night before going to the club, Vernon hosted a party at his house and Simpson attended. Simpson left the party without his phone, and Vernon delivered the phone to him that same night.

¶ 8    On the night of the incident, Vernon met his younger brother Chris at the club, but Chris did not leave the club with him. Vernon testified that he had one martini at the club, and denied telling the grand jury or Detective Wade Golab that he did not drink that night.

¶ 9    Vernon also denied that he went to his own house after leaving the club to retrieve Simpson's phone, and stated he had only done so on the night of the house party. The defense attorney read a portion of Vernon's grand jury testimony in which he stated that he entered his house to retrieve Simpson's phone. Vernon stated that this testimony concerned the night of his house party. The defense attorney then read another portion of Vernon's grand jury testimony in which he was asked where he first went when he left the club, and Vernon stated, "I went to my house because the night before I threw a little party at my house and Adam [Simpson] left his phone. I went to my house to get the phone and my little brother Chris went in the house." Vernon was unsure if he had given that answer because he had testified before the grand jury two years earlier.  He reiterated that he drove directly to Simpson's house when they left the club.

¶ 10    According to Vernon, when the shooting occurred, he saw flashing lights, heard gunshots, and saw a firearm in the defendant's hand. He saw Simpson fall, but did not see Simpson lying in the street. Vernon confirmed that he told the grand jury that he drove 1½ blocks before the defendant jumped out of the vehicle, after which he drove to his home with Quinton. Vernon testified that he called Simpson's mother, but she did not answer, so he called Simpson's friend. Vernon admitted that he previously told the grand jury that he successfully contacted Simpson's mother, but stated that he contacted her the day after the shooting.  Vernon testified that his nickname is Vino, but that it had only been his nickname for only 2 years and not in 2015.

¶ 11    Simpson testified on a hospital gurney with the attendance of medical technicians. He stated that, on the night of the incident, he and three friends went to the club at 10 or 11 p.m., where he met Vernon, Quinton, Chris, and two other individuals, BJ[3] and Kenny Wayne. In court, Simpson identified the defendant as Kenny Wayne. When Simpson first met the defendant in 2011, the defendant "wanted to fight" and "had *** a lot of animos ity against [him]."

¶ 12    According to Simpson, he left the club with Vernon, Quinton, and the defendant in Vernon's vehicle at approximatelt round 2:50 a.m.  He sat on the right side of the backseat, and the defendant sat next to him. They first drove to Vernon's house to retrieve his phone, which Simpson stated that he had left at Vernon's house the day before. They then drove to Simpson's house. On the way, he asked the defendant if he still was "out west," and the defendant responded, "How do you know I be out west?" Simpson then stated, "[R]emember you told us you got a job at your auntie['s] restaurant working?" Simpson testified that the defendant then loaded a "silver and black" firearm.  Simpson stated that he had not seen a firearm in Vernon's vehicle before that moment, and did not see where the defendant got the firearm from.

¶ 13    According to Simpson, Vernon repeatedly told the defendant to exit the vehicle and to give him the firearm. Eventually, the defendant exited the vehicle, walked around to his (Simpson's) side of the car and opened the door.  The defendant held the firearm to his (Simpson's)  head, and said, " 'Get your b*** a*** out.' " Simpson testified that he tried to run, but the defendant grabbed his hoodie and "walked [him] down three houses *** to *** the corner" with the firearm still pointed at his head. Simpson stated that the defendant shot him twice in the back of the head, and he fell to the ground.

---

[3] BJ's full does not appear in the trial transcript.

¶ 14    On cross-examination, Simpson testified that he did not drink that night and did not know if Quinton was drunk, but Vernon was "tipsy." Simpson stated that,when Vernon stopped his vehicle at his house, he went in alone to retrieve his (Simpson's) phone. Simpson reiterated that the defendant shot him "[i]n the back of [his] head where [his] spine is at." According to Simpson, Lamar Taylor exited the house with his mother and brother. His mother called the police, and Taylor "tied [his] head up" to stop the bleeding. The defense attorney asked Simpson if he remembered telling a police officer that "Vino" shot him. Simpson responded, "Yeah, I know who shot me." The defense counsel asked, "That Vino shot you?" Simpson stated, "I didn't [ever] say Vino shot me." Simpson testified that Vernon's nickname is Vino.

¶ 15    Taylor testified that, at approximately 3 a.m., he was sleeping at Simpson's sister's house when he heard gunshots coming from the front of the house. He stated that he looked out the window and saw "somebody," but laid back down. Several minutes later, someone called his name. Taylor testified that he went outside and saw Simpson lying alone in the middle of the street and bleeding from his neck. According to Taylor, Simpson stated that "Kenny Wayne shot him." The police officers and ambulance had not yet arrived when Simpson made the statement.

¶ 16    On cross-examination, Taylor denied that Simpson told him that "Vino" shot him. He stated that he told a police detective that Simpson said Kenny Wayne shot him and that "Vino was there."

¶ 17    Chicago police sergeant Sarah Vanthof testified that, on November 22, 2015, she arrived at the scene and saw Simpson, who had been shot in the back of the neck, lying face down in the middle of the street. She spoke with Simpson who said that he had been with "Vino" and that "Kenny Wayne" shot him. After Simpson was taken by ambulance to the hospital, Vanthof spoke

with him again that same day. Simpson was able to help her identify who Kenny Wayne was. Vanthof contacted an individual named Clarence who e-mailed her a photograph of the defendant. Vanthof printed the photograph which she had received, and it was entered into evidence as People's Exhibit No. 2.

¶ 18 On November 23, 2015, around 11:20 p.m., Vanthof went to the defendant's house, placed him in custody and asked for consent to search the house. Vanthof testified that she did not find a firearm, bullets, or clothing with gunshot residue or blood at the house.

¶ 19 On cross-examination, Vanthof denied that Simpson ever said "Vino" shot him. She also denied telling Officer Androniki Ganczewski that "Vino shot Adam." Vanthof reviewed the general offense case report prior to trial, but could not recall exactly when, and found an inaccurate statement, specifically, that she "related that Vino shot Adam." She could not recall mentioning this inaccuracy to Golab, the lead detective on the case. On redirect examination, Vanthof confirmed that she did not author the general offense case report, but did write a supplementary report that was "true and correct."

¶ 20 Chicago police detective Roxana Hopps testified that Golab gave her a demographic sheet and photo array advisory form. She stated that, on November 23, 2015, she showed a photo array to Simpson in the hospital which consisted of six-numbered photographs. Hopps did not have any information about the case, and was only acting as an independent administrator of the photo array. According to Hopps, when she saw Simpson he was in bed in the intensive care unit, "hooked up to a lot of machinery" with a feeding tube in his nose. Hopps learned from a doctor that Simpson had "very limited mobility" and would soon be intubated, "possibly indefinitely." According to Hopps, she made a video recording of the photo array procedure as Simpson's limited mobility

made it difficult for him to sign and circle the photo array. After being identified by Hopps, and over the objection of the defense counsel, the State entered into evidence the photo array advisory form, demographic sheet, and photo array, as well as the video of the photo array procedure. The State published the video, which we have reviewed.

¶ 21    The video recording shows Simpson lying in a hospital bed, connected to tubes, as a woman out of frame speaks with him. Simpson appears immobile, his eyes repeatedly open and close, and the woman repeatedly tells Simpson to open his eyes. The woman first states, "Adam. *** I'm going to read you something, I just need you to say 'yes' or shake your head, okay?" The woman informs Simpson that she will show him "some pictures," that the offender may or may not be included, and that she did not know who the offender is. With each statement, the woman ensures that Simpson is awake and asks Simpson to shake his head, which Simpson does. The woman also tells Simpson that the identification is being recorded due to his "mobility." Simpson expresses consent by nodding and stating, "Uh huh."

¶ 22    Then, the woman tells Simpson that she will show him six photographs, and that he needed to tell her the number of the photograph if he sees the person who shot him among the photographs shown to him. The video pans, showing the woman pointing to each photograph and reading the corresponding number for that photograph. The woman asks Simpson, "Do you see a guy in there that you recognize?" Simpson states, "Four." The woman then asks, "And what did number four do?" Simpson states, "Shot me." Our review of the photo array, which is also in the record on appeal, shows that the photograph designated as number four depicts the same person seen in the photographs of defendant that were previously entered into evidence.

¶ 23    On cross-examination, Hopps denied that she spoke with the doctor about how Simpson's trauma or medication may affect his memory.

¶ 24    The parties stipulated to the authenticity Simpson's medical records, and the records were entered into evidence. The parties subsequently amended the stipulation to further provide that, if called to testify, Dr. Ellen Omi would state that she was Simpson's treating physician from November 22, 2015, through December 4, 2015, when Simpson was discharged. Simpson was admitted for a gunshot wound to the left neck, which caused a "C-7 burst fracture" and "complete spinal cord injury," and that he was unable to move his lower extremities. Simpson was diagnosed with a "C-7 cervical fracture" and paraplegia. He was discharged to a long-term care facility where he required monitoring of his respiratory tracheostomy tube, and his discharge plan reflected a diagnosis of post-traumatic quadriplegia. Dr. Omi would also testify that certain pages in the medical records listed the drugs prescribed to Simpson. The parties further stipulated that if called to testify, Dr. Schiable would identify the records of the operations he performed on Simpson.[4]

¶ 25    The defense called Golab as a witness in its case-in-chief.  He testified that, as the lead detective of the case, he visited the crime scene, reviewed the case reports, and spoke with Simpson, the defendant, witnesses, and the officer who prepared the general offense case report. Golab did not personally recover any evidence, but "believe[d]" that a bullet casing and "[s]ome blood" were recovered from the scene. Golab stated that he also spoke with Taylor, but could not remember exactly when or where.  He denied that Taylor told him that Simpson said Vino shot him.  Rather, Golab interpreted Taylor's statement to mean that Simpson said "Vino was there," and the shooter had a nickname like "Kenny Johnson." The parties stipulated that the general

_____

[4] Dr. Schiable's operation record does not appear in the trial transcript.

offense case report stated that Golab "related that he asked Simpson who shot him, and Simpson told him that it was Kenny Wayne that shot him. Simpson also said that it was Vino."

¶ 26     Golab testified that he also spoke with Vernon, who was nicknamed Vino. Golab was shown a supplemental report which he reviewed.  Golab then confirmed that, during his interview of Vernon, Vernon said that he went to his own house to retrieve Simpson's phone before going to Simpson's house, and that Vernon and Quinton had not been drinking that night.  Golab then confirmed that, during his interview with Vernon, Vernon said that he went to his own house to retrieve Simpson's phone before going to Simpson's house, and that Vernon and Quinton had not been drinking that night. Golab testified that he attempted to speak with Simpson "soon after" the shooting and asked Simpson "if Kenny Wayne shot him," but it was difficult for Simpson to speak. The next time Golab visited Simpson, a photo array was conducted.  Golab visited Simpson a third time with an assistant State's Attorney and asked Simpson "yes or no questions," including "Did Kenneth Robinson shoot you?" Golab did not know what medications Simpson was on and could not recall asking the doctor about Simpson's medication. The supplemental report was entered into evidence.

¶ 27     The parties stipulate that, if called as a witness, Ganczewski would testify that she wrote the general offense case report in which she reported that Vanthof "stated to reporting officer that Adam Simpson had been shot in the neck, and that he stated to her, quote, Vino shot me, end quote."  It was also stipulated that Ganczewski did not file any reports amending the general offense case report.

¶ 28     At the close of evidence, the defense presented a motion to suppress "any in-court or out of court identification" of the defendant by Simpson. The defendant alleged that while in the

hospital Simpson received "numerous drugs, including fentanyl, propofol, dilauded, and others" and that Simpson was still on this medication when Golab visited him twice and asked "leading questions," and also when Hopps conducted the photo array that led to Simpson's identification of the defendant as the shooter. The defendant argued that the actions of Golab and Hopps were "unnecessarily conducive to mistaken identification" and tainted Simpson's in-court identification of the defendant. The State argued that the motion was untimely, to which the defense responded that it was based on testimony presented at trial.

¶ 29    The trial court acknowledged that the timeliness of the defendant's motion to suppress was "problematic," and asked defense counsel whether he sought an additional hearing on the motion. Counsel responded that he did not. The trial court stated it would consider the merits of the motion, "[t]aking the evidence as a whole as it's already been introduced" at trial. Subsequently, the trial court denied the defendant's motion to suppress, finding that Simpson had voluntarily identified the defendant as the shooter "to the police" and in an "excited utterance" "prior to being shown any photographs or given the name of [the defendant]." Further, the court observed that Simpson had known the defendant since 2011, and that Simpson described "animosity" between him and the defendant. The court concluded that the questions that were posed to Simpson by the police did not suggest the identification of the defendant.

¶ 30    Following closing arguments, the trial court found the defendant guilty of six counts of attempt first degree murder and one count of aggravated battery, and not guilty of aggravated kidnaping. As to the defendant's identification, the court found that the evidence established beyond a reasonable doubt that the defendant shot Simpson. The court reasoned that Simpson had known the defendant for four years prior to the shooting and there was animosity between the two

for "some unknown reason." The court emphasized that Simpson had identified the defendant as the shooter to Taylor before any police or medical personnel arrived. Moreover, Taylor, Simpson, and Vanthof all denied that Simpson ever stated Vino shot him. The court noted that it was "sloppy" that the report stating Vino shot Simpson was not corrected, but it believed the testimony showing that the statement was never made.

¶ 31    The defendant filed a posttrial motion, alleging, in relevant part, that the State failed to prove beyond a reasonable doubt that he shot Simpson.  He asserted that the general offense case report reflected that Simpson had said that Vino shot him, Simpson's identification of the him as the offender resulted from unnecessarily suggestive identification procedures, and that the trial court erred in denying his motion to suppress. The State argued, in relevant part, that the trial court properly denied the defendant's motion to suppress, as the witnesses had consistently testified that Simpson identified the defendant as the person who shot Simpson..

¶ 32    The trial court denied the defendant's posttrial motion. Following a hearing, the court merged the counts into one count of attempt first degree murder, and sentenced the defendant to 31 years' imprisonment which included a 25-year firearm enhancement.

¶ 33    On appeal, the defendant first argues that the State failed to prove him guilty beyond a reasonable doubt of attempt first degree murder, where Simpson's identification of him as the shooter was inconsistent and tainted by a suggestive identification procedure, Vernon was "significantly impeached" as to the events of the night, and the State failed to present a "clear motive" for the shooting or any physical evidence. The State responds that the defendant's claims are rooted in a single mistake in a police report and that the testimony and trial evidence

overwhelmingly showed that Simpson consistently identified the defendant as the person who shot him.

¶ 34    "The due process clause of the fourteenth amendment to the United States Constitution requires that a person may not be convicted in state court 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). Further, "[t]he State bears the burden of proving beyond a reasonable doubt the identity of the person who committed the charged offense." *People v. Lewis*, 165 Ill. 2d 305, 356 (1995). When reviewing a challenge to the sufficiency of the evidence, this court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000) (quoting *Jackson v. Virginia*, 433 U.S. 307, 319 (1979)).

¶ 35    In applying this standard, this court may not retry the defendant. *People v. Nere*, 2018 IL 122566, ¶ 69.  Rather, it is the role of the trier of fact "to determine the credibility of witnesses, to weigh their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence." *People v. Williams*, 193 Ill. 2d 306, 338 (2000).  Testimony is insufficient to support a finding of guilty "only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 280. We "must allow all reasonable inferences from the record in favor of the prosecution" (*People v. Givens*, 237 Ill. 2d 311, 334 (2010)), and will not reverse a conviction unless the evidence is "so unreasonable,

improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt" (*People v. Bradford*, 2016 IL 118674, ¶ 12).

¶ 36    "Identity is at issue whenever [a] defendant denies he was the offender." *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 44. In assessing whether a defendant's identification as the offender was sufficient, Illinois courts apply the factors outlined in *Neil v. Biggers*, 409 U.S. 188 (1972). See *People v. Slim*, 127 Ill. 2d 302, 307 (1989). The *Biggers* factors for evaluating an identification are:

> "(1) the opportunity the victim had to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the victim at the identification confrontation; and (5) the length of time between the crime and the identification confrontation." *Id.* at 307-08.

¶ 37    Courts also consider "whether the witness was acquainted with the suspect before the crime." *People v. Brooks*, 187 Ill. 2d 91, 130 (1999). An identification is insufficient where it is "vague or doubtful." *Slim*, 127 Ill. 2d at 307. "[A] single witness' identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification." *Lewis*, 165 Ill. 2d at 356.

¶ 38    Under section 9-1(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-1(a)(1) (West Supp. 2015)), a person commits first degree murder when the person "kills an individual without legal justification," and "in performing the acts which cause the death *** either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another." "A person commits the offense of attempt when, with intent to commit a

specific offense, he or she does any act that constitutes a substantial step toward the commission of that offense." 720 ILCS 5/8-4(a) (West 2014).

¶ 39    Initially, the evidence at trial showed that Simpson had known the defendant for four years prior to the shooting. See *Brooks*, 187 Ill. 2d at 130 (stating that the witness's acquaintance with the defendant was "the strongest factor" supporting the witness's identification of the defendant, where the witness had known the defendant for about four years); see also *People v. Barnes*, 364 Ill. App. 3d 888, 895 (2006) ("The persuasiveness of identification testimony is strengthened by the witness's prior acquaintance with the accused."). Illinois courts have found identifications to be satisfactory where the identifying witness was acquainted with the defendant, despite the fact that certain of the *Biggers* factors may have weighed in the defendant's favor. See *People v. Smith*, 362 Ill. App. 3d 1062, 1079 (2005) (finding the witness's identification was reliable where the witness had "occasionally seen [the defendant] on the streets of Evanston," even though the defendant's face was partially covered during the offense and the witness testified she was unable to pick the defendant out of a lineup "out of *** fear"). Accordingly, we find that Simpson's acquaintance with the defendant carries particular weight in determining that the defendant was sufficiently identified as the individual who shot Simpson..

¶ 40    Turning to the *Biggers* factors, the first factor weighs in favor of the defendant's identification being sufficient. Simpson spent the night at a club with the defendant and a group of other people. They left the club in Vernon's vehicle, and Simpson shared the backseat with the defendant the entire way from the club to Simpson's home. Simpson had ample opportunity to view the defendant at the time of the crime, as he was in close proximity to the defendant in the backseat of Vernon's vehicle, and watched the defendant load a firearm, exit the vehicle, walk

around to his (Simpson's) side of he vehicle, pull him out of the vehicle, and drag him down the street by the hood before the defendant shot him. See *People v. Corral*, 2019 IL App (1st) 171501, ¶ 77 (when determining the first *Biggers* factor, courts consider "whether the witness was close enough to the accused for a sufficient period of time under conditions adequate for observation" (internal quotation marks omitted)).

¶ 41    The second *Biggers* factor also supports the accuracy of Simpson's identification of the defendant. At trial, Simpson provided clear and specific testimony as to his conversation with the defendant prior to the shooting, as well as the color of the defendant's firearm. Simpson also specifically described the way that the defendant exited the vehicle, told him to get his "b*** a*** out" of the vehicle, and pulled him to the location where he shot him. Simpson's detailed testimony reflected his high degree of attention at the time of the offense. *People v. Branch*, 2018 IL App (1st) 150026, ¶ 26 (finding the second factor satisfied where the identifying witness testified as to details regarding the defendant's firearm); *In re J.J.*, 2016 IL App (1st) 160379, ¶ 30 (finding the second factor weighed in favor of the identification being reliable, where the identifying witness's testimony was "detailed and descriptive and indicated that [the witness] was acutely aware of what was happening" during the offense).

¶ 42    The third factor—the accuracy of any prior descriptions of the defendant—is neutral and does not favor either party, as the trial transcript does not contain any physical descriptions of the defendant that were given prior to trial. *People v. Green*, 2017 IL App (1st) 152513, ¶ 111 (finding the third *Biggers* did not apply where the identifying witness "never provided a prior statement to the police"); *People v. Carlton*, 78 Ill. App. 3d 1098, 1105 (1979) (finding the third *Biggers* factor

was "neutral" where the record did not contain a description of the offender given by the identifying witness).

¶ 43    The fourth factor, the level of Simpson's certainty in identifying the defendant, also weighs in favor of finding the identification of the defendant sufficient. Simpson consistently testified that he saw the defendant with a firearm at the time of the shooting. When the defense pressed Simpson about whether he originally stated that Vino shot him, Simpson displayed a high degree of certainty and stated, "I know who shot me," and "I didn't [ever] say Vino shot me." There is nothing in the record reflecting that Simpson had any doubt that the defendant shot him. See *People v. Macklin*, 2019 IL App (1st) 161165, ¶¶ 29, 31 (finding the identification was made with a sufficient level of certainty, where the witnesses identified the defendant consistently from a lineup, and one witness testified that he identified the defendant "with '100 percent' certainty").

¶ 44    The fifth *Biggers* factor, the length of time between the crime and the identification, also weighs heavily in favor of finding the identification sufficient. Taylor testified at trial that about five minutes after hearing gunshots, he went outside and saw Simpson lying on the ground and bleeding from his neck. Simpson told Taylor that Kenny Wayne shot him, and the testimony at trial showed that Kenny Wayne was the defendant's nickname. Although the defendant asserts that Simpson's identification of him was the product of suggestive identification procedures conducted at the hospital, the evidence established that Simpson initially identified the defendant at the scene, shortly after the shooting and prior to any interactions with police officers or medical personnel. Simpson's initial identification of the defendant was consistent with his identification of the defendant from the photo array at the hospital the day after the shooting, as well as his in-court identification of the defendant.   We find, therefore, that the fifth *Biggers* factor weighs heavily in

favor of the identification being sufficient. See *Slim*, 127 Ill. 2d at 313 (finding that an interval of 11 days between the offense and the victim's identification of the defendant from a lineup was "not significant").

¶ 45    Defendant asserts that it was unclear whom Simpson initially identified as the shooter, as evidence showed Simpson first identified Vino. However, the only suggestion that Simpson said the it was Vino shot him is in the general offense case report, which Vanthof testified was an inaccuracy. The trial court expressly found that this portion of the report was a typographical error, and that the testimony of the witnesses stating that Simpson never said Vino shot him was credible. As the trier of fact, it was the trial court's responsibility to resolve these conflicts in the evidence and determine the credibility of witnesses, and we will not overturn its findings unless those findings are against the manifest weight of the evidence. *Williams*, 193 Ill. 2d at 338.   The consistency of the witnesses' testimony that Simpson never identified Vino as the shooter leads us to conclude that the trial court's finding is not against the manifest weight of the evidence.

¶ 46    The defendant also claims that the lack of evidence of a "clear motive" should raise a reasonable doubt as to his guilt. However, this court has previously noted that "the prosecution is not required to prove motive in order to sustain a conviction for attempted murder." *People v. Furdge*, 332 Ill. App. 3d 1019, 1023 (2002). Similarly, the lack of physical evidence linking the defendant to the offense, and the impeachment of Vernon regarding whether he and Quinton drank on night of the shooting and whether he drove straight to Simpson's house, do not affect the sufficiency of the evidence. Simpson's strongly corroborated testimony alone was sufficient to sustain the defendant's convictions. See *People v. Herron*, 2012 IL App (1st) 090663, ¶ 23 (where the trial court found a single witness's identification and testimony credible, "[t]he State was not

required to present corroborating physical evidence" to sustain the defendant's convictions); see also *People v. Cook*, 129 Ill. App. 3d 531, 534 (1984) (finding the impeachment of various State witnesses did not create a reasonable doubt as to the defendant's guilt, as such matters were "to be weighed by the trial judge in his determination of credibility"). Accordingly, we find the evidence at trial was sufficient to prove the defendant guilty beyond a reasonable doubt.

¶ 47 The defendant next argues that the trial court erred in denying the motion to suppress. According to the defendant, when Golab first visited Simpson in the hospital, he posed leading questions to Simpson while Simpson was under the influence of medication. He asserts that Golab planted the idea in Simpson's mind that he was the person who shot him. The defendant claims that this visit, along with the subsequent photo array procedure and Golab's third visit, amounted to an unnecessarily suggestive identification procedure that tainted Simpson's identification of him.

¶ 48 "Only where a pretrial encounter resulting in an identification is 'unnecessarily suggestive' or 'impermissibly suggestive' so as to produce 'a very substantial likelihood of irreparable misidentification' is evidence of that and any subsequent identification excluded by law under the due process clause of the 14th amendment." *People v. Moore*, 266 Ill. App. 3d 791, 796-97 (1994) (quoting *Biggers*, 409 U.S. at 196-97). It is the defendant's burden to show that a pretrial identification was "impermissibly suggestive." *People v. Ayoubi*, 2020 IL App (1st) 180518, ¶ 31. However, even if the identifications were unjustified or suggestive, they may still be admissible where "there are present sufficient indicia of reliability." *People v. Kelley*, 304 Ill. App. 3d 628, 637 (1999). "[I]f the State can prove by clear and convincing evidence that the identifications had

an independent origin in the witnesses' memories of events at the time of the crime, the identifications may still be admissible." *Id.*

¶ 49 Generally, a motion to suppress "shall be made before trial unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion." 725 ILCS 5/114-12(c) (West 2014). In this case, however, the defendant filed his motion to suppress at the end of trial. Notwithstanding, the trial court entertained the defendant's motion and asked whether the defense requested a hearing thereon. Defense counsel declined. The trial court then denied the motion based on the evidence adduced at trial, concluding that Simpson had voluntarily identified the defendant as the shooter prior to being shown any photographs or given the defendant's name. Essentially, the trial court determined that the defense did not meet its burden to show that the pretrial identification was impermissibly suggestive. *Ayoubi*, 2020 IL App (1st) 180518, ¶ 31.

¶ 50 This conclusion was well-grounded in the record. As to Simpson's identification of the defendant to police, the testimony at trial established that, while Simpson was still at the scene and prior to any of the identification procedures conducted at the hospital, he stated that defendant shot him. Additionally, Taylor's testimony showed that Simpson identified the defendant as the shooter before any police officers or medical personnel arrived at the scene. Thus, although the defendant posits that defense counsel could not cross-examine Simpson about his identification or the photo array before Hopps' testimony, the trial evidence as a whole supported the trial court's finding that Simpson's recollection of the events was not the product of any improper identification procedures. Consequently, we reject the defendant's alternative argument that the trial court erred in denying his motion to suppress his identification.

¶ 51 For the foregoing reasons, we affirm the defendant's conviction.

¶ 52    Affirmed.