2022 IL App (2d) 200791-U
No. 2-20-0791
Order filed February 16, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19-CF-260 |
| | ) | |
| ADOLFO LOYA, | ) | Honorable |
| | ) | Donald M. Tegeler Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices McLaren and Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held*:  (1) The victim's testimony was sufficient to establish that defendant committed aggravated criminal sexual abuse by placing his hand on her breasts. (2) Defendant's argument that his trial counsel was ineffective was forfeited for lack of development.

¶ 2   Defendant, Adolfo Loya, appeals from his conviction, after a bench trial, of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2018)).  The guilty count alleged that he "committed an act of sexual conduct with L.A., a person over 13 years of age but under 17 years of age, and the defendant is at least 5 years older than L.A., in that the defendant touched L.A.'s breast with his hand for the purpose of the sexual arousal of the defendant."  Defendant's principal

contention is that, because L.A.'s testimony was vague about how he touched her, the evidence did not establish that he committed an act of sexual conduct with her. Alternatively, defendant argues that his trial attorney was ineffective for failing to (1) inform defendant of the immigration consequences of a conviction, (2) call certain witnesses, (3) object to the State's leading questions, and (4) object when the State shifted the burden of proof to the defense during the State's closing argument. We hold that L.A.'s testimony specifically described defendant's sexual conduct with L.A. and supported his conviction. We further hold that defendant has forfeited his ineffectiveness-assistance claims by failing to provide adequate supporting argument. We thus affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was charged by indictment with one count of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2018)) and one count of attempted aggravated criminal sexual abuse (720 ILCS 5/8-4(a), 11-1.60(d) (West 2018)). The first count was as we have described it; the second count alleged the same age elements but alleged that defendant attempted to put his mouth on LA.'s breast. The State alleged that the acts took place from August 19 through August 20, 2018. (The evidence suggested that the offense took place around midnight on August 19, 2018.)

¶ 5     Defendant elected a bench trial. In defendant's opening statement, trial counsel asserted that defendant lacked the opportunity to commit the offenses and that L.A. must have been lying to escape her poor living conditions. Specifically, counsel stated:

> "[S]ometime in late July, mother literally plants her 15-year-old daughter and her cousin, who I think is a little bit older, in this room. You are going to see pictures. Judge, I would refer to it as a dungeon. It is the most decrepit, small room. Nothing in it except, I believe he will testify, they put a little couch and a sleeping bag.

This girl had to live in this situation week after week. \*\*\*

\* \* \*

Again, I believe you will see physically the confines of the house.

[Defendant] will tell you this never happened. The only reason he can think that this was said is this was an opportunity for [L.A.] to get out of this dungeon.

And at the close of the case, Judge, he didn't have any opportunity."

¶ 6 The parties stipulated that defendant was born on August 15, 1974. The evidence showed that L.A.'s mother, Paloma P., arranged with defendant to rent a basement room in defendant's one-story house. Defendant and his family lived on the first floor. The room Paloma rented was in poor repair and furnished only with a couch. The bathroom was in the hall and was shared with two male tenants who also lived in basement rooms. L.A. said that she rarely encountered the other tenants. Testimony suggested that the only cooking facilities were a microwave and a refrigerator shared by the basement tenants. Defendant kept two pit bulls caged in the basement hallway.

¶ 7 Although L.A. testified that Paloma lived in the room, all the testimony was consistent in suggesting that she was there only occasionally. L.A. lived in the room full-time for three or four weeks; her cousin, Katherin H., had moved in slightly earlier.

¶ 8 L.A. testified that her birthdate was March 1, 2003, so that she was 16 years old when the trial took place in October 2019 and 15 years old in August 2018. She said that defendant was a friend of the family but that she had seen him only infrequently as she was growing up. After moving into the basement room in defendant's house, she was on the first floor of the house only once when she ate breakfast with defendant and his family.

¶ 9 On August 19, 2018, L.A. and Katherin had spent the evening together away from the

house. Katherin's boyfriend drove L.A. and Katherin back to the house late that evening. (On cross-examination, L.A. agreed that she must have arrived at the house slightly before 10 p.m. because Katherin would have needed time to get to work by 10 p.m.) When she arrived at the house, defendant was outside with at least one other person. Because she saw many beer bottles nearby, she believed that defendant and whoever else was there were drinking. She and Katherin went down to their room together, but Katherin left soon afterward.

¶ 10    After Katherin left, defendant knocked on her door at a later time to ask L.A. if she wanted to come to eat with his family. (On cross-examination, L.A. agreed that defendant likely did not come to her door until three or four hours after Katherin left.) L.A. opened the door, and she and defendant started talking about family and school. According to L.A., defendant initially asked her only to lie down, which she did. He then massaged her back and neck over her clothing. He started to reach under her shirt from the bottom and began to touch the sides of her chest. In L.A.'s words:

> "After he made conversation, he sat on my couch and he started massaging me. And then he—he wanted me to lay down, and he kept massaging me; and then he wanted me to turn around and lift up my shirt and my bra."

The State asked L.A. what defendant was doing with his hands. She responded by gesturing. Neither party described the gesture for the record.

¶ 11    The State asked L.A. to give more detail about how defendant touched her:

> "Q. When you said he was going like this (indicating), was he touching another part of your body besides your back?
>
> A. Yes, the sides of my chest.
>
> Q. Okay. When you say 'my chest', do you mean your breasts?

A. I do.

Q. What was happening or what happened next?

A. He wanted me to turn around so he could massage my front, and he asked me to lift up my shirt.

Q. Did he ask you to turn around on the couch?

A. He did.

Q. And did you?

A. I did.

Q. So what was your positioning on the couch at that point?

A. My back was on the couch.

Q. And where was he at that point?

A. He was sitting on the couch.

Q. And so what happened next?

A. He wanted me to lift up my shirt and my bra, and I didn't want to; and he lifted it up himself and I tried to cover myself.

Q. Did he—what was he saying at that point?

A. He asked me in Spanish, 'Have they ever massaged you like this?

And I said, 'No, never.'

And then he said, 'What about like this?' And his face leaned towards my chest.

Q. When he said, 'What about like this', was he doing anything with his hands?

A. No, he had stopped.

Q. He had stopped?

A. To approach me.

Q. Did he ever massage or try to massage any other part of your body?

A. He touched my breasts.

Q. Can you describe how that occurred?

A. When I was—when he wanted me to turn around and to lift up my shirt and he did it himself, he touched me, and I tried to cover myself.

Q. When you say he did it himself, did he lift up your shirt?

A. Yes.

Q. And then did he lift up your bra?

A. Yes.

Q. What were you doing at that point?

A. I was trying to cover myself."

¶ 12    L.A. also testified that defendant seemed to try to put his mouth on one of her breasts. When he leaned towards her, she pushed him away and asked him to leave, telling him that "it was not okay for him to do that to his family." When asked whether defendant "[said] anything to [her] about [her] mom," L.A. said that defendant told her not to tell her mother what had happened. After making other remarks, which L.A. could not remember, defendant left.

¶ 13    L.A. explained that, because she had partly persuaded herself that what defendant was doing to her was acceptable, she did not react quickly when defendant's behavior started becoming sexual. However, at some point, it crossed a line such that she could no longer tell herself that it was acceptable. On cross-examination, L.A. estimated that defendant was in her room for about half an hour. She further estimated that ten minutes passed from the time he touched her breasts to the time he left the room.

¶ 14    When defendant left, L.A. used her phone to contact Katherin, who sent a ride-share vehicle

to give L.A. a ride to the gas station where Katherin worked. L.A. spent the rest of the night at the gas station with Katherin and went to the police the next day, August 20, 2018. L.A. and her family moved out of defendant's house that day.

¶ 15   Katherin testified that she returned with L.A. to defendant's house shortly before her shift began at the gas station where she worked. Defendant, who was with a friend, opened the gate at the house for her and L.A. As she passed defendant on the way in, she noticed that he seemed drunk, so she urged L.A. to lock the door to the room. She believed that defendant was drunk because he was holding a beer and she could smell beer on him. Further, he "was acting a little bit more aggressively," "like a drunk person would act." Defendant "was patting [Katherin] really hard." As Katherin was leaving, defendant told her that, if there was food left, he would tell L.A. to come upstairs and have some.

¶ 16   At about 12:30 a.m., L.A. texted Katherin that something had happened. They then spoke and, in response, Katherin sent an Uber vehicle to bring L.A. to the gas station where Katherin was working. After Katherin's shift ended at 6 a.m., she and L.A. briefly returned to defendant's house. They then told Paloma about defendant's actions. They went to the police the same day. L.A. and Katherin never returned to defendant's house.

¶ 17   Nireda D. Vargas, defendant's wife, testified for the defense. She, defendant, and their two young boys lived on the first floor of their house. On August 19, 2018, she and defendant had about six family members visiting the house. The visitors left by about 9 p.m. She went to bed at about 10:30 p.m. Defendant came to bed at about 11 p.m. She would always feel when he got up from the bed. That night, she did not feel him get up after he came to bed.

¶ 18   Eduardo Benitez, one of the tenants with a basement room, testified that he returned home at about 9:30 p.m. on August 19, 2018. He spoke briefly to defendant. While they spoke, L.A.

and Katherin returned to the house and Katherin left again. Benitez then took a shower to get ready for work. While he was showering, defendant knocked on the door to say that he was leaving some food for Benitez in the microwave in the common area of the basement.

¶ 19 Shortly after he showered, Benitez got a call from his employer telling him not to come in, so he stayed in his room talking to his girlfriend. His room had a common wall with the room where L.A. and Katherin stayed. That night, he did not hear anyone talking in that room after he went to his room. The dogs always reacted noisily when defendant came down to the basement. That night, he did not hear any noise from the dogs after defendant came down to leave food in the microwave.

¶ 20 Defendant testified that he was cleaning up after the party when Benitez returned to the house. About 20 minutes later, Katherin and L.A. also returned. He was talking to Benitez at the time and did not say anything to either of them. He denied that he patted Katherin. He had drunk four or five beers throughout the afternoon and evening but was no longer drinking when Katherin and L.A. arrived. He was still talking to Benitez when Katherin left again.

¶ 21 Sometime later, defendant went to the basement to offer leftover food to Benitez—it was his custom to share any leftovers with Benitez. Benitez was showering at the time, so defendant got his attention and told him that his food was on top of the microwave. When defendant came down, the dogs were outside the home. Defendant confirmed that the dogs would make "[a] lot of noise" when they saw him. He returned to the basement only once more that night, when he returned the dogs to their cages. This was shortly after he brought food to Benitez. He did not offer any food to L.A.

¶ 22 In closing argument, the State suggested that defendant had failed to show that L.A. had a motive to lie about defendant's acts. The State argued:

"[Defendant] tries to lift up her shirt. He lifts up her bra. Finally *** that's when [L.A.] told him, 'Enough, stop, just leave,' and he left.

But [defendant] didn't leave, Judge. He was conscious of covering his tracks. He said to her, 'You are not going to tell your mom, right?' Because he knew what he did was wrong. He knew she was too young. He knew he shouldn't have touched her, and he wanted to make sure he could get away with it.

Judge, the defense has presented no motive for [L.A.] to make this up."

At this point, trial counsel objected. The trial court sustained the objection, noting that "[t]he defense doesn't have to suggest or prove anything."

¶ 23 The court found defendant guilty of aggravated criminal sexual abuse (touching L.A.'s breast for sexual gratification) and not guilty of attempted aggravated criminal sexual abuse (attempting to place his mouth on L.A.'s breast for sexual gratification). The court commented that it accepted L.A.'s entire testimony. The court found her testimony sufficient to establish that defendant touched her breasts but not that he attempted to place his mouth on her breast.

¶ 24 Defendant filed a motion for a new trial, which the trial court denied. The court sentenced defendant to 48 months' sex-offender probation with 60 days in jail.

¶ 25 Defendant, represented by new counsel, filed a timely motion to reconsider the denial of the motion for a new trial. Defendant alleged multiple respects in which his trial counsel was ineffective, including that counsel failed to inform him of the immigration consequences of a conviction. Defendant also argued that his jury waiver was not knowing and voluntary in that counsel failed to explain the differences between a jury trial and a bench trial and told him to elect the latter "so he would not go to jail."

¶ 26     At the hearing on defendant's motion, new counsel did not present testimony. Counsel argued that trial counsel failed to explain to defendant what a bench trial was. Defendant was so confused after his trial that he did not realize that he had been found guilty. Counsel also argued that trial counsel failed to explain to defendant the immigration consequences of a conviction and that defendant needed such information to decide between a bench trial and a jury trial.

¶ 27     The court denied the motion to reconsider. Defendant filed a timely notice of appeal.

¶ 28                                      II. ANALYSIS

¶ 29     On appeal, defendant argues that the evidence was insufficient to sustain his conviction. Alternatively, he argues that trial counsel was ineffective in multiple respects.

¶ 30     The State responds that defendant has forfeited both contentions by failing to provide adequate record citations and that his ineffective-assistance claim is further flawed for lack of supporting argument. Alternatively, the State argues that defendant's contentions fail on the merits.

¶ 31     Initially, we reject the State's contention that defendant has forfeited his sufficiency-of-the-evidence claim by failing to cite "the pages of the record relied on" as required by Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020). Rule 341(h)(7) provides that an appellant's brief must include "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). "Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Defendant's statement of facts has appropriate citations to the record. His argument section, although somewhat short, contains citations in most places they are needed. We thus may address defendant's sufficiency-of-the-evidence claim on its merits. However, as we will later

discuss, defendant has forfeited his ineffective-assistance claim by failing to support it with proper argument as required by Rule 341(h)(7).

¶ 32    We review the sufficiency of the evidence under the standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), as adopted by *People v. Collins*, 106 Ill. 2d 237 (1985).  When a reviewing court decides a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "  (Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson*, 443 U.S. at 319).  "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution."  *People v. Davison*, 233 Ill. 2d 30, 43 (2009).

> "Under [the standard of *Jackson* and *Collins*], the reviewing court does not retry the defendant, and the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence. [Citation.]  But merely because the trier of fact accepted certain testimony or made certain inferences based on the evidence does not guarantee the reasonableness of its decision.  A conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of [the] defendant's guilt."  *People v. Ross*, 229 Ill. 2d 255, 272 (2008).

¶ 33    The elements of aggravated criminal sexual abuse, as set out in section 11-1.60(d) of the Criminal Code of 2012, are, in relevant part:

> "A person commits aggravated criminal sexual abuse if that person commits an act of sexual penetration or sexual conduct with a victim who is at least 13 years of age but under

17 years of age and the person is at least 5 years older than the victim." 720 ILCS 5/11-1.60(d) (West 2018).

"Sexual conduct" is defined in relevant part as:

"any knowing touching or fondling by *** the accused, either directly or through clothing, of the *** breast of the victim *** for the purpose of sexual gratification or arousal of *** the accused." 720 ILCS 5/11-0.1 (West 2018).

¶ 34 Defendant first argues that the State's evidence was insufficient in that L.A.'s testimony, even if credited, failed to prove that defendant committed an act of sexual conduct with her. According to defendant:

"To prove the offense of aggravated criminal sexual abuse, the State had to prove that [defendant] committed an act of sexual conduct, specifically, that he 'fondled the breast' of [L.A.]. Nonetheless, the only act [L.A.] alleges [defendant] committed was touching the sides of her chest. There are no details as to how [defendant] touched the sides of [L.A.'s] chest. Furthermore, it is unclear if [defendant] touched the sides of [L.A.'s] chest above her shirt, under her shirt, over her bra, or under her bra. Because the State failed to prove that [defendant] fondled [L.A.'s] breast, [defendant's] conviction for aggravated criminal sexual abuse must be reversed."

According to defendant, the substance of L.A's testimony was as follows:

"[After returning home with Katherin], L.A. went downstairs to the basement and into her bedroom. [Katherin] left [L.A.] at some point. [L.A.] testified that at some point later, [defendant] sat on her couch and began to massage her. [L.A.] then states [defendant] asked her to lay down. [L.A.] then says [defendant] touched the sides of her chest. [L.A.] says [defendant] tried to lift her bra but she covered herself. [L.A.] says that [defendant]

did not do anything else other than the massaging. [L.A.] says [defendant] told her not to tell her mom and [L.A.] told [defendant] to leave and he left.

¶ 35    Defendant's argument rests on an inaccurate description of L.A.'s testimony. L.A. stated twice on direct examination that defendant touched her breasts. First:

> "Q. When you said he was going like this (indicating), was he touching another part of your body besides your back?
>
> A. Yes, the sides of my chest.
>
> Q. Okay. When you say 'my chest', do you mean your breasts?
>
> A. I do."

Second:

> "Q. Did he ever massage or try to massage any other part of your body?
>
> A. He touched my breasts.
>
> Q. Can you describe how that occurred?
>
> A. When I was—when he wanted me to turn around and to lift up my shirt and he did it himself, he touched me, and I tried to cover myself.
>
> Q. When you say he did it himself, did he lift up your shirt?
>
> A. Yes.
>
> Q. And then did he lift up your bra?
>
> A. Yes.
>
> Q. What were you doing at that point?
>
> A. I was trying to cover myself."

This testimony, as credited by the court, directly establishes one element of sexual conduct: that the accused touched the victim's breasts. The testimony also permits reasonable inferences that

satisfy the second element of sexual conduct: that the act was for the purpose of sexual gratification or arousal of the accused. That defendant had L.A. lie face up and then pulled up her bra and touched her breasts clearly supports the inference that his earlier touching of her breasts was not an unintentional part of a nonsexual massage.

¶ 36    Defendant suggests that L.A.'s testimony was less credible because the State's question about what she meant by her "chest" was leading. We disagree. The court, as the trier of fact, was the proper judge of L.A.'s credibility. *Ross*, 229 Ill. 2d at 272. It was in the best position to distinguish whether L.A. was truly uncertain about where defendant had touched her or merely reticent about talking about her breasts. Additionally, we note that L.A. was not being led when she testified to defendant again touching her breasts after he directed her to turn over and lie on her back.

¶ 37    Defendant further contends that L.A. was incredible because she "testified with very little recollection or detail of the alleged incident" and "was unable to provide a timeline of the events or even the length of the interaction between herself and [defendant]." Nothing in L.A.'s testimony suggested that her recollection was so defective that she could not reasonably be credited. To be sure, her recall of defendant's sexual conduct was more detailed than her recollection of the timeline. But that did not render her testimony implausible. There was no obvious reason for L.A. to recall clearly what time she got home or how many people defendant was with when she came through the gate; at that point, she was having a normal day. Moreover, we do not agree that L.A. had unusual difficulty recalling the length of her interaction with defendant. L.A. may not have understood or clearly responded to every question she was asked about timing, but she was clear that her total interaction with defendant lasted about 30 minutes, during which it started normally and became progressively more sexualized until she asked defendant to leave. A reasonable trier

of fact could choose to credit L.A.'s testimony despite minor gaps in her recollection. See, *e.g.*, *People v. Gray*, 2017 IL 120958, ¶ 44 (jury could accept the victim's testimony notwithstanding lapses in her memory).

¶ 38    Defendant also argues that the court failed to give due weight to the testimony of Vargas and Benitez. Defendant contends that their testimony tended to suggest that he could not have been present in L.A.'s room when she said he was there. He stresses that their testimony was unimpeached and their credibility unquestioned. He implies that, if the court had given their testimony its due weight, it would necessarily have found that reasonable doubt of his guilt existed. We find this argument unpersuasive.

¶ 39    Vargas testified that she and defendant shared the same bed and that defendant joined her in bed at about 11:00 on the night in question. She further testified that she would always feel when defendant would get out of the bed, and that she did not feel defendant leave the bed after he joined her. The court, however, was free to disregard this testimony given its potential bias, or, frankly, to conclude that Vargas's perception that she always awoke when defendant got out of bed might not have been completely accurate.

¶ 40    Nor was Benitez's alibi testimony dispositive. Benitez was in his room at the relevant time and thus could say only that he did not hear any of the events to which L.A. testified. However, as the State points out, although defendant testified that he returned the dogs to the basement after delivering the food, Benitez did not testify to noticing defendant's return to the basement. Thus, some evidence suggests that Benitez may not have been paying as much attention to the comings and goings in the basement as he thought. In any event, Benitez testified that he spoke with his girlfriend after showering and the incident between defendant and LA. may well have occurred during Benitez's phone conversation, when he would not be paying close attention to any noise

that was not clearly out of the ordinary. Consequently, Benitez like Vargas, was not able to provide defendant with a complete alibi.

¶ 41     Simply put, a reasonable trier of fact could give fair consideration to the testimony of Vargas and Benitez while nevertheless accepting L.A.'s account. After viewing the evidence in the light most favorable to the State, we cannot conclude that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Thus, there was sufficient evidence to support defendant's conviction of aggravated criminal sexual abuse.

¶ 42     Defendant argues in the alternative that trial counsel was ineffective for failing to (1) inform defendant that a conviction would make him deportable, (2) call as witnesses Paloma and the police officers who investigated the case, (3) object to the State's leading questions, and (4) "[m]ost importantly," object and seek a mistrial when the State shifted the burden of proof during its closing argument.

¶ 43     Defendant, however, has forfeited his ineffective-assistance claims by failing to support them with adequate argument. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Initially, he properly cites *Strickland v. Washington*, 466 U.S. 668 (1984), and *People v. Albanese*, 104 Ill. 2d 504 (1984), for the standard governing claims of ineffective assistance. However, he then fails entirely to argue the application of the law to the facts of this case. Indeed, as to the failure of counsel that defendant deems most important—the failure to seek a mistrial when the prosecutor's argument shifted the burden to the defendant—he has failed to so much as quote, cite, or reference the relevant portion of the trial record or to otherwise develop the argument. Of course, we note parenthetically that this was a bench trial, the trial court sustained the objection to the offending argument, and we presume that the court in a bench trial recognizes and disregards any improper argument. See *People v. Kelley*, 304 Ill. App. 3d 628, 639 (1999).

¶ 44    Further, despite recognizing that a defendant claiming ineffective assistance must show that counsel's unreasonable assistance caused him prejudice (see *Strickland*, 466 U.S. at 687), defendant has completely failed to explain how counsel's actions prejudiced him.  Given this failure, we cannot address defendant's claim of ineffective assistance without making his argument for him, a task that is inappropriate for a reviewing court.  See, *e.g.*, *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 29 ("A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented; this court is not a repository into which an appellant may foist the burden of argument and research; it is neither the function nor the obligation of this court to act as an advocate or search the record for error.").  Thus, we do not address defendant's ineffectiveness claims on their merits.

¶ 45                                III. CONCLUSION

¶ 46    For the reason stated, we affirm the judgment of the circuit court of Kane county.

¶ 47    Affirmed.